**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Clifford W. Taylor    Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 24, 2008

CARL STONE and NANCY STONE,

      Plaintiffs-Appellees,

v                               No. 133986

DAVID A. WILLIAMSON, M.D.,
JACKSON RADIOLOGY
CONSULTANTS, P.C., and W. A. FOOTE
MEMORIAL HOSPITAL,

      Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, C.J.

In this case, the Court is called on to examine the doctrine of "lost opportunity" set forth in MCL 600.2912a(2), which prohibits recovery for the loss of an opportunity to survive or achieve a better result unless the opportunity was greater than 50 percent, and the construction of that statute in *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002). The Court of Appeals in this case considered the aggregate of complications plaintiff faced and concluded that plaintiff satisfied the statute, using *Fulton*'s requirement that the difference between his chance of a better result without malpractice and his chance

of a better result despite the alleged malpractice was greater than 50 percentage points. I conclude that the second sentence of MCL 600.2912a(2) does not apply to this case. Moreover, I believe the second sentence is unenforceable because it provides no guidance regarding its meaning or how courts are to apply it. A medical-malpractice plaintiff must prove that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant. Because the evidence presented at trial would support the jury's verdict under my analysis, I conclude that there is no need to conduct a new trial and would therefore affirm the result of the Court of Appeals judgment but not its analysis.

## I. FACTS AND PROCEEDINGS

Plaintiff suffered the rupture of an abdominal aortic aneurysm that had gone undetected despite physical examinations and testing by a number of physicians.[1] He underwent emergency surgery to repair the rupture, but, in part because of preexisting conditions, amputation of both legs at mid-thigh was ultimately necessary. After surgery, plaintiff continued to experience multiple organ failure and other complications, including acute renal failure, sepsis, rhabdomyolysis, osteomyelitis, recurrent pancreatitis, and depression. His home

---

[1] Throughout this opinion, "plaintiff" refers to Carl Stone; the claim of his wife, Nancy Stone, is derivative in nature.

required structural changes to accommodate his wheelchair and specialized needs, and his wife quit her employment to assist with his daily care needs.

Plaintiff brought a medical-malpractice suit against the radiologist and two vicariously liable entities on the theory that a negligent diagnosis resulted in the rupture and all resulting harm. At the jury trial, plaintiff presented experts who testified that, had the aneurysm been properly diagnosed, elective surgery could have been performed. Such elective surgery would have greatly increased plaintiff's chance of a better medical outcome, including a reduction of the risk of amputation and other health complications. Plaintiff's medical experts testified that a patient having elective surgery to repair an aortic aneurysm has a 95 percent chance of attaining a good result, which includes surviving the rupture, as well as avoiding additional medical complications. In contrast, misdiagnosed patients whose aneurysms rupture have only a 10 percent chance to achieve a good result. Specifically, the experts opined that 80 percent of patients with a rupture of an aortic aneurysm die, either en route to obtain medical care or during the emergency surgery. Of the 20 percent of patients with ruptures who manage to survive, 40 to 50 percent have some form of complication. This contrasts markedly with those undergoing elective repair, who face less than a 5 percent risk of dying or suffering serious complications.

Defendants argued that the risk of death should be factored out because plaintiff avoided it and that the risk of complications other than death was 5 to 12 percent for elective surgery and up to 40 percent for emergency surgery. Taking

3

the numbers most favorable to plaintiff, 5 and 40, defendants argued that the difference was at best 35 percent. The specific risk of amputation suffered by plaintiff was 1 percent for elective surgery and 5 percent for emergency surgery: a paltry difference of 4 percent. The trial court disagreed with defendants' theory, however, and instructed the jury to consider the aggregate risk of complications.

The jury returned a verdict in favor of plaintiff for a total amount of $2,327,835. Following reduction for the damages cap[2] and collateral sources, the court entered a judgment in the amount of $1,936,682, of which $1,640,800 was for the verdict and the remainder was for interest, costs, and attorney fees. The trial court denied defendants' postjudgment motions for a new trial and judgment notwithstanding the verdict.

The Court of Appeals affirmed in an unpublished opinion per curiam, issued April 17, 2007 (Docket No. 265048). On the issue of "loss of opportunity," it agreed with the trial court that plaintiff had met the requirements of the statute because he had gone from a 95 percent chance of attaining a good result to a 10 percent chance of attaining a good result. *Id*. at 5. The Court considered the aggregate of all the increased risks that plaintiff faced as a result of the alleged malpractice and applied the *Fulton* formula to that aggregate risk.

---

[2] MCL 600.1483.

4

This Court granted leave to appeal, directing the parties to address

(1) whether the requirements set forth in the second sentence of MCL 600.2912a(2) apply in this case; (2) if so, whether the "loss of an opportunity to survive or an opportunity to achieve a better result" should be determined by considering the aggregate increased risk posed by the alleged malpractice, including risks associated with injuries that the patient did not suffer and any increased risk of death, or whether the only consideration should be the increased risk of the specific injury or injuries suffered by the patient; (3) whether *Fulton v William Beaumont Hosp*, 253 Mich App 70 (2002), was correctly decided, or whether a different approach is required to correctly implement the second sentence of § 2912a(2), such as that described in Roy W. Waddell, M.D.'s *A Doctor's View of Opportunity to Survive: Fulton's Assumptions and Math are Wrong*, published in the March, 2007 edition of the Michigan Bar Journal at 32; and (4) whether the Court of Appeals erred when it determined that the plaintiffs met the requirements of § 2912a(2). [480 Mich 895 (2007).]

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for judgment notwithstanding the verdict, viewing the evidence and all legitimate inferences in the light most favorable to the nonmoving party. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). Similarly, we review de novo questions of statutory interpretation. *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 59; 631 NW2d 686 (2001). When interpreting a statute, the Court's primary goal is to give effect to the intent of the Legislature. *Brown v Detroit Mayor*, 478 Mich 589, 593; 734 NW2d 514 (2007). The first step is to review the language of the statute. *Id.* If the statute is unambiguous on its face, we presume that the Legislature intended the meaning expressed, and judicial construction is neither required nor permissible. *Id.*

5

However, when a statute is ambiguous on its face—that is, equally susceptible to more than a single meaning—judicial construction is appropriate to determine the meaning. *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 164-166; 680 NW2d 840 (2004).

## III. ANALYSIS

At issue in this case is subsection 2 of MCL 600.2912a, which reads:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. [MCL 600.2912a(2).][3]

Although the lower courts did not question the applicability of the second sentence of MCL 600.2912a(2) to plaintiff's claim, treating it as one for loss of opportunity, this Court expressly requested the parties to address the issue. Plaintiff argues that he never pleaded his claim as one for loss of an opportunity; instead, his is a simple case of physical injury directly caused by negligence. In his brief, he asserts that a case involving a loss of opportunity occurs in very specific circumstances: "where a plaintiff cannot prove that the defendant's acts or

---

[3] In addition, subsections 1(a) and (b) of the statute both include language requiring the plaintiff to show that, "as a proximate result of the defendant failing to provide [the appropriate standard of practice or care], the plaintiff suffered an injury." MCL 600.2912a(1)(a) and (b).

omissions proximately caused his injuries, but can prove that the defendant's acts or omissions deprived him of some chance to avoid those injuries."

This definition is in accord with Michigan caselaw. In the first Michigan case to refer to the legal theory of "the value of lost chance," the Court of Appeals explained: "This theory is potentially available in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries." *Vitale v Reddy*, 150 Mich App 492, 502; 389 NW2d 456 (1986). The Court in *Vitale* noted that allowing such claims would expand existing common law, and it declined to do so, stating that such a decision "is best left to either the Supreme Court or the Legislature." *Id*. at 504. In a footnote, the Court observed that the wrongful-death statute, MCL 600.2922,

> requires proof that the wrongful acts or omissions were the cause of death. The statutory provision would not allow a plaintiff to recover in a situation where he could prove only that defendant's acts or omissions were the cause of a lost chance but could not prove that defendant's acts or omissions were the cause of death. [*Id.* at 504 n 4.]

In accord with this analysis, this Court has stated: "The lost opportunity doctrine allows a plaintiff to recover when the defendant's negligence *possibly*, i.e., [by] a probability of fifty percent or less, caused the plaintiff's injury."

7

*Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997) (emphasis added).[4] The *Weymers* Court aptly described the lost-opportunity doctrine as "the antithesis of proximate cause."  *Id*.[5]  In cases in which the plaintiff alleges that the defendant's negligence more probably than not caused the injury, the claim is one of simple medical malpractice.  *Id*. at 647-648.

In *Falcon v Mem Hosp,* 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized a claim for lost opportunity to survive.  *Falcon* was a wrongful-death case in which this Court allowed a claim to go forward even though the plaintiff's granddaughter would have had only a 37.5 percent chance of surviving a medical accident had she received proper care.  Because proper medical procedures had not been followed, the granddaughter's chance of surviving the accident went to essentially zero.  The lead opinion in *Falcon* admitted that the plaintiff could not show that the malpractice had more likely than not caused her granddaughter's death, but could show that it had caused her granddaughter to lose a "substantial opportunity of avoiding physical harm."  *Id*. at 470 (Levin, J.).  The

---

[4] Although this Court decided *Weymers* long after the statute at issue was enacted in 1993, the negligence alleged in *Weymers* occurred before 1993. Accordingly, the Court applied the common law rather than the statute.

[5] I agree with Justice Cavanagh's reasoning and conclusion that Justice Markman's definition of a lost-opportunity case is overbroad and inconsistent with the common-law meaning at the time MCL 600.2912a(2) was enacted. *Post* at 17-20.  Long before *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990), plaintiffs successfully brought actions for medical malpractice even though they had preexisting conditions or might have had a bad result despite being properly treated.

lead opinion disavowed the traditional rule that requires a plaintiff to show that, but for the defendant's negligence, the patient would not have suffered the physical harm, saying that the "more probable than not standard, as well as other standards of causation, are analytic devices—tools to be used in making causation judgments." *Id*. at 451. Instead, despite the fact that the plaintiff could not show that the doctor's malpractice had more probably than not caused her granddaughter's death, the plaintiff had a claim because the malpractice did cause her granddaughter harm. The 37.5 percent chance for a better outcome was "hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore." *Id*. at 460. This harm occurred *before* the granddaughter's death, at the moment "[w]hen, by reason of the failure to implement [certain] procedures," she was denied any opportunity of living. *Id*. at 469, 471 n 44. The lead opinion characterized its holding as requiring the plaintiff to show, more probably than not, that the malpractice reduced the opportunity of avoiding harm: "failure to protect [the granddaughter's] opportunity of living."[6] *Id*. at 469. Loss of her 37.5 percent opportunity of living, the lead opinion stated,

---

[6] Only Justice Archer joined Justice Levin's lead opinion. Justice Boyle wrote a concurrence, joined by Justice Cavanagh, that agreed that tort law should allow a claim for "lost opportunity to survive" when "the negligence of the defendant more probably than not caused the loss of opportunity." *Falcon, supra* at 472-473 (Boyle, J., concurring). However, the concurrence noted that "any language in the lead opinion suggesting that a similar cause of action might lie for a lost opportunity of avoiding lesser physical harm is dicta." *Id*. at 473.

"constitutes a loss of a substantial opportunity of avoiding physical harm." *Id.* at 470.

The lead opinion in *Falcon* thus concluded that the loss-of-opportunity claim accrued not when the patient died, but at the moment she went from having a 37.5 chance of survival to having no chance of survival. Under this theory, a plaintiff would have a cause of action independent of that for the physical injury and could recover for the malpractice that caused the plaintiff to go from a class of patients having a "good chance" to one having a "bad chance." Without this analysis, the plaintiff in *Falcon* would not have had a viable claim because it could not have been shown that the defendant more probably than not caused the physical injury. Until *Falcon*, medical-malpractice plaintiffs alleging that the defendant's act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant's malpractice more probably than not was the proximate cause of the injury. See, e.g., *Morgan v Taylor*, 434 Mich 180; 451 NW2d 852 (1990); *Naccarato v Grob*, 384 Mich 248, 252; 180 NW2d 788 (1970); *Skeffington v Bradley*, 366 Mich 552; 115 NW2d 303 (1962).

When the Court decided *Falcon*, MCL 600.2912a read:

> In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

> (a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

Three years after *Falcon*, the Legislature enacted 1993 PA 78, amending MCL 600.2912a to add the second subsection. In its entirety, the statute as amended reads:

*(1) Subject to subsection (2),* in an action alleging malpractice, the plaintiff *has* the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice *or care* in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

(b) The defendant, if a specialist, failed to provide the recognized standard of *practice or* care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.

*(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.* [New language emphasized.]

As can be seen, the Legislature retained the already-existing language, making it subsection 1 of the statute. Both subsection 1(a) and subsection 1(b) require the plaintiff to show that, "as a proximate result of the defendant failing to

11

provide [the appropriate standard of practice or care], the plaintiff suffered an injury." Further, the Legislature added subsection 2. Specifically, the first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant's malpractice more probably than not caused the plaintiff's injury. The second sentence of subsection 2 adds that, in medical-malpractice cases, a "plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies "*in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries . . . .*" *Vitale, supra* at 502 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant's malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible. Accordingly, I conclude that the two sentences of subsection 2 create a paradox, allowing claims in the second sentence while precluding them by the first sentence.

While it is tempting to argue, as Justice Cavanagh does, that the Legislature intended to allow as an "injury" a plaintiff's lost chance alone, without proof of physical injury, this Court addressed that issue in *Wickens*. In *Wickens*, *supra* at 60, the Court stated that the first sentence of subsection 2 "expressly limits recovery to injuries that have already been suffered and more probably than not

12

were caused by the defendant's malpractice." A reduction of a person's chances of avoiding injury is not itself a present injury, but is only an indication of the likelihood of suffering a future injury. *Id.* at 60-61. Therefore, because of the statutory present-injury requirement, the plaintiff in *Wickens* could not recover for her reduced expected life span—the exact kind of injury that *Falcon* allowed. Moreover, it has never been the law in this state that a negligence suit can be sustained when the alleged negligence did not cause a physical injury to a person or property. *Henry v Dow Chem Co*, 473 Mich 63, 75-76; 701 NW2d 684 (2005). The Legislature would have understood that this is what the term "injury" encompassed when it enacted the language reiterating this traditional requirement: the plaintiff must have an *injury* proximately caused by the defendant.[7] *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 439-440; 716 NW2d 247 (2006). Thus, what the Legislature intended by the statute was likely something more

---

[7] While *Falcon* superficially recognized this, it determined that the patient's death, which could not be said to have been caused by the doctor's malpractice, was the physical injury she suffered. By permitting the plaintiff to recover for a different injury (loss of an opportunity to survive), the Court ignored the fundamental requirement that a tort plaintiff must suffer a physical injury that was caused by the defendant's negligence. Instead of clarifying that it was significantly redefining "injury" in a wholly new way, the lead opinion in *Falcon* first focused almost completely on relaxing the burden of proof regarding causation. See, e.g., *Falcon, supra* at 449-453 and nn 5 and 6, 455-457 (Levin, J.). Then it recited foreign cases holding that a reduction in chances is a compensable injury and determined that to be sound. *Id.* at 461-468. The opinion did not appear to recognize that this was contrary to a considerable body of existing Michigan caselaw. See *id.* at 494 (Riley, J., dissenting) ("The recovery of damages for the loss of a mere chance eviscerates the principles that underlie our tort law.").

traditional: a situation in which an injury might have occurred anyway, but in which the defendant's act or omission hastened or worsened it in such a way that the plaintiff suffered more severe physical injury than he or she would have had the negligence not occurred. As noted, before *Falcon*, such cases were litigated under the ambit of traditional medical-malpractice law.[8]

In my view, there is little question that the statute cannot be interpreted as written. Avoiding the underlying paradox of the statute allowing in one sentence suits that in another sentence it precludes, the Court of Appeals, interpreting the second sentence by itself in *Fulton*, found two possible, and fully contradictory, constructions, each of which could be achieved only by adding words to the statute. The *Fulton* Court expressed the issue before it as whether the second sentence of the statute requires a plaintiff to show "only that the *initial* opportunity to survive before the alleged malpractice was greater than fifty percent . . . or, instead, that the opportunity to survive was *reduced by* greater than fifty percent because of the alleged malpractice . . . ." *Fulton, supra* at 77-78 (emphasis

---

[8] Justice Cavanagh asserts that a plaintiff cannot claim a lost opportunity "unless [the] plaintiff suffered a verifiable *loss*." *Post* at 9 n 2. Justice Markman appears to agree with him that a bad result must occur, otherwise the opportunity has not been lost. *Post* at 14-15. Certainly, in such cases the defendant's conduct might have increased the likelihood of a bad result. Yet if the plaintiff is unable to show that the defendant's negligence caused the bad result, how can he or she nonetheless show that the defendant's negligence caused the opportunity to be lost? This is the heart of the problem with allowing loss-of-opportunity claims: either the patient has a concrete injury, in which case he or she should be required to prove causation, or the plaintiff does not, in which case the defendant should not be held liable. See *Henry, supra* at 75-76.

14

added). The Court noted that the statute was ambiguous because reasonable minds could differ regarding which of these meanings could be read from the words of the statute. The Court concluded that the first interpretation required that the word "initial" be inferred to modify "opportunity" and that the second required that the words "loss of" be inferred to modify "opportunity." *Id*. at 80. Apparently finding itself obligated to choose one of these two interpretations, the Court then decided that the second construction was the one intended by the Legislature because it reflected the Legislature's rejection of *Falcon*.[9] The Court asserted that the lead opinion in *Falcon* had focused on the "extent of the loss" and that the Legislature was insisting on a greater loss for the claim to be actionable. Id. at 82-83. However, *Falcon*'s focus was almost entirely on the plaintiff's initial opportunity being substantial, and so it is *equally* plausible that the Legislature merely intended for a plaintiff to have an initial opportunity of more than 50 percent. Both interpretations proposed in *Fulton* implicate a negative reaction to *Falcon*, and nothing in the statutory language, the statutory context, or the statute's history gives any further clues to assist in choosing the "correct" interpretation.

---

[9] I agree with Justice Cavanagh, *post* at 12, that Justice Markman's interpretation (and that of *Fulton*) improperly adds to the statute the words "loss of," effectively replacing the word "opportunity" where it is used the second time with the phrase "loss of opportunity." The only basis for adding this language is the simple desire to make the statute so read.

It is confounding to attempt to ascertain just what the Legislature was trying to do with this amendment. Even if it was trying to create a remedy for the "injury" of a reduction in chances following medical malpractice, by imposing the threshold of greater than 50 percent it may well have eliminated most of the cases that might benefit from such a rule. For example, if the patient in *Falcon* had enjoyed a greater than 50 percent initial likelihood of survival (that is, she was not likely to die even with proper treatment), the plaintiff probably would have brought a standard medical-malpractice case, and the jury would have decided proximate cause in the usual way. It was only because the plaintiff could not show that the patient more probably than not would have survived but for the doctor's negligence that prompted the plaintiff to seek her remedy under the doctrine of lost opportunity.

As written, the second sentence of MCL 600.2912a(2) can be made understandable only by adding words or by redefining "injury" in a way significantly contrary to the mass of caselaw at the time the sentence was added. Another possible alternative reading is that the second sentence of subsection 2 was intended not to create a new type of claim, but to limit courts from expanding the common law so far as to allow cases like *Falcon*. None of these multiple, contradictory interpretations can be shown to be the "correct" construction of legislative intent. Choosing between them can only be a guess. Moreover, it remains that the second sentence impossibly conflicts with the requirement of a proximate cause of the injury in both the first sentence of subsection 2 and in

16

subsection 1. Accordingly, I conclude that the second sentence of subsection 2 cannot be judicially enforced because doing so *requires* the Court to impose its own prerogative on an act of the Legislature.[10]

I find the second sentence of MCL 600.2912a(2), as written, substantially incomprehensible because (1) it either cannot be harmonized with the proximate-cause requirement of the rest of the statute or creates by implication a new cause of action contrary to common law and (2) it provides no guidance regarding its correct application. The remaining portions of MCL 600.2912a should continue in effect. MCL 8.5.

This would leave, for medical-malpractice claims, the requirement imposed by the statute that "the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2).[11] In addition, the word "injury" would continue to retain its meaning in tort of a present physical injury to person or property. I believe that, by codifying and restating the requirements of

---

[10] See, e.g., *Mini Spas, Inc v State*, 657 P2d 1348, 1350 (Utah, 1983) (refusing to rewrite "by judicial intervention" an act purporting to create a regulatory board because the act "cannot be implemented as written" and stating that "[p]laintiff must seek a solution to this problem from the Legislature"); *Warren v Branan*, 109 Ga 835, 840; 35 SE 383 (1900) (holding that the provisions of an act seeking to establish the geographical limits of a town "are so indefinite, uncertain, and incomplete that the legislative intent can not be ascertained and given effect, and that therefore the act is wholly inoperative").

[11] Even if we were to strike both sentences of subsection 2, the proximate-cause requirement would remain in subsection 1.

17

causation and injury in existence at the time *Falcon* was decided, the Legislature effectively overruled *Falcon* and reinstated the traditional elements of medical-malpractice claims.

In accord with my conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible as written, I would hold that *Fulton*'s construction of that part of the statute is no longer good law.[12] I believe that the Legislature intended to retain the traditional proximate-cause requirement in effect before *Falcon* and that that is what a plaintiff must prove.[13]

---

[12] Moreover, to the extent it could be considered as providing a method of determining proximate cause in failure-to-diagnose cases, I believe that *Fulton* was incorrectly decided. *Fulton*'s simplistic formula fails to consider that some patients would achieve a good result *regardless* of whether they received proper or improper treatment and, conversely, that some patients would achieve an unfavorable result regardless of the quality of their treatment. In any formula assessing causation, patients who would have had a favorable outcome regardless of treatment need to be taken out of the equation. See, e.g., Waddell, *A doctor's view of "opportunity to survive"*: Fulton's *assumptions and math are wrong*, 86 Mich B J 32 (March 2007). Accordingly, I agree with Justice Markman that Waddell's formula is one method of accurately assessing causation in cases in which there are multiple possible contributing causes.

[13] I agree with Justice Markman that if the Legislature desires to allow a cause of action for lost opportunity, it should do so in a way that clearly indicates when such claims are allowed and how they should be analyzed. *Post* at 36 n 26. For example, *Falcon*'s analysis was based on a method found in King, *Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences*, 90 Yale L J 1353 (1981), which identified several ways of analyzing lost-opportunity claims.

## IV. APPLICATION

Although I believe that the lower courts erred by applying *Fulton* and that the trial court incorrectly instructed the jury on the issue of whether plaintiff had shown that defendant's negligence caused him to lose a greater than 50 percent chance of a better result, I would conclude that it is not necessary to order a new trial. For each defendant, the trial court instructed the jury that it had to find by a preponderance of the evidence (1) that the defendant was professionally negligent, (2) that plaintiff sustained injury and damages, and (3) that the professional negligence or malpractice of that defendant was a proximate cause of the injury and damages. After giving these instructions, the court further instructed the jury: "I'm going to talk about damages. In an action alleging claims of professional negligence against a physician, even if you find professional negligence, the Plaintiff cannot recover unless the Plaintiff's chance of having a better result was changed by greater than 50 percent." Thus, after being instructed that it had to find the traditional elements of medical malpractice and, in addition, had to find that plaintiff had lost an opportunity of greater than 50 percent, the jury returned a verdict indicating it had found that all these elements were satisfied. Indeed, a review of the record shows that plaintiff suffered amputations and other injuries, and from the testimony presented the jury could have concluded that it was more likely than not that the amputations and other injuries were caused by the defendants' negligence and would not have occurred absent that negligence. Most importantly, regardless of the jury's finding of lost opportunity, it is clear from the

19

way the instructions were given that the jury found that the traditional elements were met: defendants' negligence more probably than not caused plaintiff's injuries. Thus, I believe that the jury properly found that plaintiff had satisfied the causation and injury elements. Accordingly, I would hold that reversal is not required and would affirm the result of the judgment of the Court of Appeals.

## V. SUMMARY

In an attempt to clarify for the reader the majority and minority positions on each issue, I provide the following summary:

All seven justices would affirm the result of the Court of Appeals decision and the judgment for plaintiff. Six of the justices believe that this is not a lost-opportunity case; Justice Markman would hold that it is such a case. All seven justices believe that *Fulton*'s analysis is incorrect or should be found to no longer be good law, though their reasons for doing so vary.[14] Justices Corrigan and Young and I would find that *Fulton* is no longer good law because we would hold that the statute is unenforceable as written. Justice Markman would hold that *Fulton* is inconsistent with the statutory language. Justices Weaver, Cavanagh, and Kelly would hold that *Fulton* is incorrect because it erroneously added words

---

[14] However, because a majority of justices hold that this is not a lost-opportunity case, the issue of the correctness of *Fulton* cannot be reached, and *Fulton*'s approach remains undisturbed as the method of analyzing lost-opportunity cases. Nonetheless, because the patient in *Fulton* would likely have survived had she received a timely diagnosis, I would assert that the claim should have been treated as one for ordinary medical malpractice and that the lower courts erred in applying to it the doctrine of lost opportunity.

to the statute when analyzing the phrase "the opportunity." Of the four justices holding that the statute is not unenforceable as written (Justices Weaver, Cavanagh, Kelly, and Markman), only Justice Markman would define the term "opportunity" in accordance with the Waddell article, while the other three (Justices Weaver, Cavanagh, and Kelly) would define it in accordance with *Falcon*, but with a higher threshold than *Falcon* required. The same four justices (Justices Weaver, Cavanagh, Kelly, and Markman) would hold that loss of the opportunity is, by itself, a compensable injury, although the opportunity must be "lost"—that is, the bad result must occur—in order for a claim to accrue.

Given this montage of issues and positions created by the language of this statute, it would be helpful for the Legislature to reexamine its goal and the policies it wishes to promote and strive to better articulate its intent in that regard.


Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.

21

S T A T E   O F   M I C H I G A N

SUPREME COURT

CARL STONE and NANCY STONE,

      Plaintiffs-Appellees,

v                                                                                    No. 133986

DAVID A. WILLIAMSON, M.D.,
JACKSON RADIOLOGY
CONSULTANTS, P.C., and W. A. FOOTE
MEMORIAL HOSPITAL,

      Defendants-Appellants.

_____

CAVANAGH, J.

I agree with Chief Justice Taylor that the evidence presented in this case supports a traditional medical-malpractice claim; thus, I concur that the jury's verdict should be upheld. However, I do not agree with the conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible and unenforceable. Therefore, I respectfully disagree with Chief Justice Taylor's analysis of that provision.

Chief Justice Taylor identifies two problems with MCL 600.2912a(2) that he believes render it partially unenforceable: (1) the first and second sentences conflict and (2) the second sentence is incomprehensible. I disagree, because the circumstances of the 1993 amendment of this statute clarify the meaning of the statutory language and resolve both concerns.

THE ORIGINS OF THE LOSS-OF-OPPORTUNITY DOCTRINE

The history of the loss-of-opportunity doctrine is highly relevant to the interpretation of MCL 600.2912a(2) because this Court's adoption of the doctrine evidently prompted the Legislature to add that provision. In *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized the loss-of-opportunity doctrine.[1] *Falcon* involved a wrongful-death claim brought on behalf of a woman who had suffered an amniotic embolism during childbirth. As in all negligence cases, the plaintiff was required to show causation to establish a valid medical-malpractice claim. *Falcon* discussed various causation theories. Some courts have required a plaintiff to establish "that it is more probable, measured as more than fifty percent, that, but for such negligence, the patient would not have suffered the physical harm." *Id.* at 449 (Levin, J.). *Falcon* termed this the "more probable than not standard." *Id*. at 451. Under this standard, "a plaintiff who establishes that the patient would have had more than a fifty percent opportunity of not suffering physical harm had the defendant not acted negligently, recovers one hundred percent of the damages." *Id*. at 450. The plaintiff in *Falcon* could not have maintained a wrongful-death action under the more-probable-than-not

_____

[1]Justice Levin wrote *Falcon*'s lead opinion, which Justice Archer signed. I joined Justice Boyle's opinion, which concurred in the recognition of the loss-of-opportunity cause of action, but clarified that we were only called upon to determine whether such claims exist when the ultimate harm is death. Thus, a majority of this Court agreed on the fundamental principles of the loss-of-opportunity doctrine, although Justice Boyle and I would have limited the discussion to the harm that the *Falcon* plaintiff suffered—death.

standard—the decedent only had a 37.5 percent chance of surviving even without the alleged malpractice, so it was not more probable than not that the physician's malpractice caused the decedent's death. *Id.* at 460.

While the plaintiff in *Falcon* could not recover for the injury of her granddaughter's wrongful death, we ruled that the plaintiff nevertheless had a different cause of action available to her. *Falcon* adopted the approach taken by other courts that recognized "*loss of an opportunity* for a more favorable result, *as distinguished from the unfavorable result*, as compensable in medical malpractice actions." *Id*. at 461 (emphasis added). "Under this approach, damages are recoverable for the loss of opportunity although the opportunity lost was less than even, and thus it was not more probable than not that the unfavorable result would or could have been avoided." *Id*. at 461-462. Thus, the *Falcon* decision explicitly recognized loss of an opportunity to avoid physical harm as a distinct *injury*. A plaintiff could bring a claim for loss of an opportunity to avoid death, even if she could not maintain a claim for the death itself because she could not establish causation for the death.

*Falcon*'s approach to calculating damages for a loss-of-opportunity claim also indicates that it treated the lost opportunity as a distinct injury, not simply a direct physical-harm injury that enjoyed a lower causation standard. Because the plaintiff's granddaughter in *Falcon* allegedly lost a 37.5 percent chance of survival, we concluded that the appropriate measure of damages would be "37.5 percent times the damages recoverable for wrongful death . . . ." *Id*. at 471. Thus,

generally speaking, "'[t]he proper computation of damages would limit the damages recoverable to only that amount of reduced chance of recovery actually caused by the physician's negligent conduct.'" *Id*. at 472 n 47 (citation omitted). We consulted *Mays v United States*, 608 F Supp 1476, 1482-1483 (D Colo, 1985), for its method of computing damages attributable to the defendant. *Falcon,* 436 Mich at 471-472 (Levin, J.). In *Mays*, malpractice had reduced the patient's opportunity to survive from 40 to 15 percent, so the court computed the damages by multiplying the opportunity lost (40 minus 15) by the net pecuniary loss to determine the damages for the harm caused by the defendant. *Id*. Calculating the damages this way permitted the plaintiff "to recover damages only for the reduction in the patient's opportunity of survival." *Id*. at 472. This calculation isolates the value of the injury that can be causally linked to a defendant's negligence—the loss of an opportunity. The value of a loss-of-opportunity claim is measured by the *extent* of the loss; so, clearly, the injury being compensated is the loss of a particular amount of opportunity. By contrast, the measure of damages in a traditional claim for wrongful death or physical harm is, generally speaking, the value of damages attributable to the death or physical harm; as such, the injury being compensated is the death or physical harm.

In sum, when *Falcon* adopted the loss-of-opportunity doctrine, it recognized that the injury of loss of an opportunity was distinct from the injury of suffering the associated physical harm—which, in that case, was death. However, *Falcon* indicated that not all losses of opportunity were actionable; rather, a

4

plaintiff must suffer the loss of a *substantial* opportunity for a better result. "The cause of action accrues when harm and damages result from the loss of a substantial opportunity for a better result." *Id*. at 470 n 43. We concluded "that loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm," but declined to "decide what lesser percentage would constitute a substantial loss of opportunity" in other circumstances. *Id*. at 470.

Finally, *Falcon* emphasized that a loss-of-opportunity cause of action was not exempt from the more-probable-than-not standard of causation. "Under this approach, the plaintiff must establish more-probable-than-not causation. He must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm." *Id*. at 462. Unlike a claim for wrongful death or physical injury, the "patient . . . need not show that it was probable, measured as more than fifty percent, that the course of the disease and treatment would have been different." *Id*. at 470 n 43. Instead, "[i]t is sufficient to show, more probably than not, that had there been a correct diagnosis, the patient would have had a substantial opportunity of avoiding the course of the disease and treatment that occurred." *Id*. Therefore, while a claim for loss of opportunity addresses a different injury than a cause of action for the physical injury itself, it is still subject to the same standard of proof of causation.

*Falcon*'s enunciation of the loss-of-opportunity doctrine is significant, because it apparently provoked the Legislature to amend MCL 600.2912a. In

5

1993, the Legislature amended that provision by adding a second subsection, which states:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.  In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.  [MCL 600.2912a(2).]

The amendment was widely understood to be a direct reaction to the *Falcon* decision.  As a majority of this Court noted, after *Falcon* adopted the lost-opportunity doctrine, "[o]ur Legislature immediately rejected *Falcon* and the lost opportunity doctrine.  MCL 600.2912a(2) . . . ." *Weymers v Khera*, 454 Mich 639, 649; 563 NW2d 647 (1997).  I agree that the amendment of MCL 600.2912a(2) was a reaction to *Falcon*, but I would not characterize it as a rejection of the lost-opportunity doctrine entirely.  It merely established the threshold for loss-of-opportunity claims.

THE PROPER INTERPRETATION OF MCL 600.2912a(2)

The Legislature's addition of MCL 600.2912a(2) should be read in light of the *Falcon* decision.  This Court follows the principle that when a statute uses a common-law term and there is no clear legislative intent to alter the common law, the term will be interpreted as having the same meaning as at common law.  *Ford Motor Co v City of Woodhaven,* 475 Mich 425, 439; 716 NW2d 247 (2006).  Additionally, the Legislature is presumed to be aware of judicial interpretations of existing law when passing legislation.  *Id*. at 439-440.  In this instance, the

6

Legislature appears to have reacted to a particular opinion of this Court, so that opinion's holdings offer considerable insight into the Legislature's intent. When interpreting MCL 600.2912a(2), then, it is important to keep in mind several principles established by the *Falcon* decision: (1) loss-of-opportunity claims are subject to the more-probable-than-not standard for proving causation, (2) the "injury" in a loss-of-opportunity claim is the loss of a substantial opportunity to avoid physical harm, not the actual physical harm itself, and (3) loss of a 37.5 percent opportunity of living constitutes a compensable loss of a substantial opportunity to avoid physical harm. Chief Justice Taylor interprets MCL 600.2912a(2) without considering these principles from *Falcon*, and thus comes to the mistaken conclusion that the statute is unenforceable and inconsistent with the lost-opportunity doctrine.

The first sentence of MCL 600.2912a(2) assigns a medical-malpractice plaintiff "the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." Chief Justice Taylor concludes that this sentence precludes lost-opportunity claims because those claims only arise when a plaintiff cannot prove that a defendant's negligence more probably than not caused the plaintiff's injury. *Ante* at 12. But this overlooks two principles gleaned from *Falcon* that the Legislature would have been aware of while drafting this sentence: loss-of-opportunity claims are subject to the more-probable-than-not standard of causation and, in such claims, the "injury" is the loss of an opportunity to avoid the physical

7

harm, not the associated physical harm itself. When the first sentence of MCL 600.2912a(2) is interpreted according to *Falcon*'s articulation, its causation requirement does not preclude claims for loss of opportunity. It simply codifies the causation requirement that applies to claims for the injury of suffering physical harm as well as claims for the injury of the loss of an opportunity to avoid physical harm. Just like *Falcon*, MCL 600.2912a(2) requires that a plaintiff asserting a cause of action for loss of opportunity prove that the defendant more probably than not caused the loss of an opportunity to survive or the loss of an opportunity to achieve a better result.

The first sentence of MCL 600.2912a(2) should also be interpreted in accordance with *Falcon*'s understanding of the word "injury." In medical-malpractice cases, the underlying injury is quite often death or some physical harm. But *Falcon* identified a distinct injury in medical-malpractice cases—the loss of a substantial opportunity to avoid physical harm. This is significant, because a lost-opportunity plaintiff, by definition, cannot prove that a defendant's malpractice more probably than not caused the patient to suffer physical harm or death. Take the example of a patient who before treatment had a 40 percent chance of survival as the result of a preexisting condition. If that patient died after being negligently treated by a physician, the plaintiff would not be able to prove that the physician's malpractice more probably than not (50 percent or greater) caused the patient's death. There was a 60 percent chance that the patient would have died regardless of the malpractice, as a result of the preexisting condition.

8

But the plaintiff might be able to show that the physician's malpractice more probably than not caused the patient to lose up to a 40 percent chance of avoiding death.[2] The first sentence of MCL 600.2912a(2) simply places this burden to prove causation on a plaintiff, whether the alleged injury is the physical harm itself or the loss of an opportunity to avoid harm.

Moreover, the explicit recognition of the loss-of-opportunity doctrine in the second sentence of MCL 600.2912a(2) supports the conclusion that the Legislature did not intend to preclude lost-opportunity claims by adopting the more-probable-than-not standard of causation. The second sentence states: "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." MCL 600.2912a(2). If the Legislature had intended to reject the lost-opportunity doctrine, it would have entirely prohibited plaintiffs from recovering for a loss of an opportunity. Instead, it permitted recovery for loss of an opportunity under certain circumstances—if the

---

[2] Chief Justice Taylor's concern that redefining "injury" in this way would permit recovery for a "lost chance alone, without proof of physical injury" is unfounded. *Ante* at 12. By definition, one does not suffer the loss of an opportunity to survive unless death occurs. Otherwise, there would have been no opportunity lost. Similarly, a claim for the loss of an opportunity to achieve a better result does not arise unless a plaintiff suffered a verifiable *loss*. The loss is the injury that the lost-opportunity doctrine recognizes. Typically, proof of an actionable loss will involve actual physical harm suffered by the plaintiff. Defining injury as such will not allow a plaintiff to recover for a potential future injury.

9

opportunity was greater than 50 percent. This sentence merely sets the threshold for invoking the loss-of-opportunity doctrine. It requires that a plaintiff's premalpractice opportunity to survive or achieve a better result was greater than 50 percent.[3]

The conclusion that the first and second sentences of MCL 600.2912a(2) do not conflict is also related to the proper interpretation of the second sentence. Chief Justice Taylor identifies an ambiguity in the second sentence that, he contends, can only be resolved by adding words or by redefining the term "injury." *Ante* at 16.[4] The Court of Appeals also identified this ambiguity in *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002). *Fulton* described the ambiguity: the second sentence of the statute requires a plaintiff to show either that the *premalpractice* opportunity was greater than 50 percent or that the opportunity was *reduced* by more than 50 percent. *Id*. at 77. In short, the ambiguous term is the statute's second use of the word "opportunity." I disagree with the conclusion that none of the multiple, contradictory

---

[3] For example, a patient who had a premalpractice opportunity to survive of 60 percent, and whose chance of survival was reduced to 20 percent because of malpractice, would have a cause of action for loss of opportunity to survive if he ultimately died. The plaintiff in that case would not have a wrongful-death action because it was not more probable than not that the negligence caused the patient's death. But he could have a cause of action for the loss of a 40 percent opportunity to survive, because the patient's premalpractice opportunity to survive was greater than the threshold of 50 percent.

[4] I disagree with the premise that a statute is ambiguous only if it is equally susceptible to more than one meaning.

interpretations can be shown to be the correct construction of legislative intent. While reasonable minds could differ with respect to the meaning of this statute, the correct interpretation can be discerned by conventional means of construction.

The proper interpretation of the second use of the word "opportunity" in MCL 600.2912a(2) can be resolved by simply considering the entire text of the sentence. The first time "opportunity" is used, the statute speaks of recovery for "loss of an opportunity to survive." MCL 600.2912a(2). By using this term from *Falcon* without modification, the Legislature adopted *Falcon*'s articulation of the lost-opportunity cause of action. And we know from *Falcon* that by the very nature of a lost-opportunity claim, the opportunity alleged to have been lost must be the premalpractice opportunity. The word "opportunity" in the phrase "loss of an opportunity" must refer to the premalpractice opportunity because that is the opportunity that is lost in some measure and, thus, creates a claim.

The second time "opportunity" is used in the sentence, it is not preceded by the phrase "loss of an." But the statute's replication of the term "opportunity" within the same sentence clearly indicates that they relate to each other and are to be construed identically. Thus, the term "opportunity" in isolation has the same meaning that it does within the phrase "loss of an opportunity to survive." Accordingly, a plaintiff cannot recover for the loss of an opportunity unless *the* opportunity—the premalpractice opportunity that was allegedly lost in some measure—was greater than 50 percent. Thus, this interpretation does not require

11

that any words be added to the sentence; it merely requires the word "opportunity" to be construed consistently within the same sentence.

The other proposed meaning of the statute's second use of the word "opportunity" would conflict with the sentence's first use of the word. Instead of reading the phrase "unless the opportunity was greater than 50%" as written, this interpretation would infer the words "loss of" in front of "opportunity." Justice Markman advocates this interpretation. He concludes that "the opportunity" clearly refers back to the "loss of an opportunity," and thus the sentence means that the loss of the opportunity must be greater than 50 percent. *Post* at 12. But this interpretation conflates the phrase "loss of an opportunity" with the phrase "the opportunity." It assumes that the Legislature used the phrase "the opportunity" as a shorthand reference for "loss of an opportunity" and requires the reader to infer the phrase "loss of" before the second use of the word "opportunity." This interpretation is less plausible than my interpretation, which gives the term "opportunity" the same meaning regardless of whether it appears alone or within the phrase "loss of an opportunity," and does not require reading language into the statute.[5] In sum, I cannot conclude that this competing

---

[5] Justice Markman denies that he reads words into the statute. *Post* at 12 n 10. But it is telling that Justice Markman has solved the inference problem present in his interpretation by repeatedly misquoting the statute. For example, he reports that MCL 600.2912a(2) "states that the 'lost opportunity' must be greater than 50 percent . . . ." *Post* at 12 n 10. He repeats that MCL 600.2912a(2) "requires that the 'lost opportunity' be 'greater than 50%'" in another portion of his opinion,

(continued…)

interpretation is correct when it poses linguistic problems that are not found in the other interpretation.

Moreover, interpreting the word "opportunity" to mean premalpractice opportunity comports with the purpose of the statute and the context in which it was adopted, while the other interpretation does not. *Falcon* adopted the loss-of-opportunity doctrine to provide a cause of action to plaintiffs who could not establish causation for physical harm, but could establish causation for the loss of a substantial opportunity to avoid that physical harm. MCL 600.2912a(2) cannot limit recovery for the loss of an opportunity to cases in which the loss was greater than 50 percent, because any plaintiff who satisfied that condition would have a traditional medical-malpractice claim for the death or physical harm itself.[6]  A

---

(…continued)
*post* at 13, and later states that MCL 600.2912a(2) "only allows a plaintiff to recover for a 'loss of an opportunity' that was 'greater than 50%,'" *post* at 15.  The selective positioning of these phrases artfully suggests that the statute actually says that the *lost* opportunity must be greater than 50 percent.  But, in fact, the statute simply requires that "*the opportunity* was greater than 50 percent."  MCL 600.2912a(2) (emphasis added).  The fact that Justice Markman is compelled to recharacterize the text of the statute in this way strongly suggests that his interpretation infers the word "lost" before the word "opportunity."

[6] Justice Markman asserts that I am incorrect on this point because, for example, plaintiff in this case can show that he lost an 80 percent opportunity to achieve a better result (no amputation), but "cannot prove that defendant's malpractice caused the amputation, as he would be required to do in a traditional medical-malpractice action . . . because there was at least a 1 percent chance that plaintiff would have suffered an amputation even with proper treatment." *Post* at 33.  From this argument, it would appear that Justice Markman believes that medical-malpractice actions require a plaintiff to prove that a defendant's negligence was a 100 percent cause of his injury.  However, we have explained
(continued…)

13

plaintiff who can show that malpractice caused the loss of a more than 50 percent opportunity to avoid death or physical harm can meet the more-probable-than-not standard of causation for the associated death or physical harm. This interpretation would permit a loss-of-opportunity claim when a plaintiff's chance for survival was reduced from 80 percent to 20 percent, but not when the plaintiff's chance for survival was reduced from 80 percent to 40 percent. It would not make sense to permit a plaintiff whose chance of survival was reduced from 80 percent to 20 percent to bring a lost-opportunity claim, because that plaintiff could show that the negligence more probably than not caused the death, thus establishing a traditional wrongful-death claim. Meanwhile, the statute would

---

(…continued)

that the element of "cause in fact" in negligence does not require a plaintiff to "prove that an act or omission was the *sole* catalyst for his injuries . . . ." *Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004). Rather, a plaintiff "must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Id*. This is consonant with the caselaw of other jurisdictions, and holds true regardless of whether a plaintiff's preexisting condition was a possible cause of his injury. In medical-malpractice cases,

> the courts have uniformly adopted the position that *proof of causation does not require that it be shown that the patient was certain to have recovered or improved with sound medical care*, and it has often been said that the plaintiff may sustain the burden of establishing proximate causation with evidence that it was probable, or more likely than not, that the patient would have been helped by proper treatment. [Anno: *Medical malpractice*: *"Loss of chance" causality,* 54 ALR4th 10, 18 (emphasis added).]

The Legislature codified this position in MCL 600.2912a(2), which gives the plaintiff the burden of proving that the defendant's negligence more probably than not proximately caused his injury.

14

deny recovery for the loss of an opportunity to a plaintiff who suffered death, but could only show that the malpractice reduced his opportunity to survive from 80 percent to 40 percent. The plaintiff in that case would be left with no cause of action at all; he could not meet the more-probable-than-not standard of causation for the injury of death, and he would be precluded from bringing a lost-opportunity claim because he lost only 40 percent of his opportunity. This cannot be the result intended by the Legislature. This interpretation of the statute would prevent *Falcon*'s intended class of plaintiffs from bringing a loss-of-opportunity claim, while still recognizing a cause of action for loss of opportunity. It would provide a class of plaintiffs who already have a traditional medical-malpractice cause of action with an additional cause of action for loss of opportunity. Such a result is illogical in light of one significant purpose of the statute—to codify the loss-of-opportunity doctrine recognized in *Falcon*.

Finally, interpreting the statute as referring to the premalpractice opportunity is consistent with the history of the amendment. That is, MCL 600.2912a(2) is understood to be a legislative reaction to *Falcon*. MCL 600.2912a(2) retained the loss-of-opportunity doctrine, so it could not have been intended to entirely preclude the class of plaintiffs recognized by *Falcon* from bringing such claims; such a drastic step would be entirely at odds with the rationale of the loss-of-opportunity doctrine. Rather, MCL 600.2912a(2) retained the doctrine, but set the threshold at 50 percent, so that only plaintiffs who had a greater than 50 percent premalpractice opportunity to survive or achieve a better

15

result could bring a claim. This interpretation is the only reasonable explanation for the Legislature's action—it aligns with the Legislature's apparent intent to both endorse the doctrine and place a limit on it. In sum, I concur with Chief Justice Taylor that plaintiff in this case proved a traditional medical-malpractice claim based on his physical injuries and that the jury's verdict should be upheld.[7] Plaintiff did not assert, or need to resort to, a claim for loss of opportunity. However, I disagree that the second sentence of MCL 600.2912a(2) is substantially incomprehensible. The correct interpretation of the second sentence can be discerned by an examination of the text of the statute. The result of this analysis is confirmed by the history of both the loss-of-opportunity doctrine and

---

[7] There was adequate evidence that the doctor's malpractice proximately caused plaintiff's injuries. It is undisputed that plaintiff's aneurysm ruptured and that he suffered amputation of his legs as a result. The jury heard testimony that, had plaintiff been diagnosed earlier and undergone elective surgery, his chance of having complete success with no complications would have been approximately 95 percent, his chance of death would have been 1 to 5 percent, and his chance of amputation would have been 1 percent. Given the rupture, his approximate chance of complete success with no complications dropped to 5 to 10 percent, his chance of death became 60 to 90 percent, and his chance of surviving, but suffering amputation, became 5 percent. When a patient's chance of complete success drops from 95 percent to less than 10 percent because of a doctor's malpractice, and the patient suffers one of the natural complications, the jury's conclusion that the malpractice proximately caused that injury is warranted. If the jury in this case could only have considered the specific risk of amputation, as Justice Markman suggests, *post* at 35 n 25, plaintiff would essentially be penalized for managing to survive an event that few others do. While the risks associated with harms that were not actually suffered by a plaintiff are not relevant to the extent of a plaintiff's lost opportunity, potential risks stemming from a physician's malpractice may be relevant to the jury's determination of whether malpractice caused a plaintiff to suffer a particular harm rather than achieve a good result.

16

the statute. There is no internal conflict within the statute. The loss-of-opportunity doctrine is entirely consistent with the more-probable-than-not causation standard, so there is no conflict between the first and second sentences of MCL 600.2912a(2).

RESPONSE TO JUSTICE MARKMAN

Justice Markman's approach to interpreting MCL 600.2912a(2) is grounded in several faulty premises. The first is that traditional medical-malpractice cases require that there be "no question that the proper treatment would have resulted in a good outcome," because otherwise "it cannot be proved that the improper treatment caused the bad outcome." *Post* at 36. This proposition would preclude plaintiffs with preexisting conditions that might have contributed *slightly* to their injuries from bringing medical-malpractice claims. It would also preclude medical-malpractice claims from arising in situations in which proper medical treatment does not *always* succeed.[8] This proposition cannot be correct. Plaintiffs

---

[8] Justice Markman cites no authority for the proposition that a plaintiff may only recover for traditional medical malpractice if proper treatment would not have resulted in the bad result suffered by the plaintiff. If true, that principle would foreclose virtually all traditional medical-malpractice cases. With almost any medical procedure, there is a statistical probability that a patient will experience a bad result, even if the procedure is performed properly. As just one example, the Food and Drug Administration (FDA) counsels patients considering LASIK eye surgery that while "[m]ost patients are very pleased with the results of their refractive surgery[,] . . . like any other medical procedure, there are risks involved." Food and Drug Administration, Center for Devices and Radiological Health <http://www.fda.gov/cdrh/LASIK/risks.htm> (accessed July 2, 2008). The FDA advises that the risks of LASIK surgery include loss of vision, debilitating
(continued…)

alleging medical malpractice, regardless of whether they have preexisting conditions, are not required to prove that a defendant was a 100 percent cause of their injuries; they must simply prove more-probable-than-not causation. After all, traditional medical-malpractice claims are subject to the same principles of causation as other negligence claims. As Prosser & Keeton, Torts (5th ed), § 41, p 270, notes, "[w]hen a child is drowned in a swimming pool, no one can say with certainty that a lifeguard would have saved the child; but the experience of the community permits the conclusion that the absence of the guard played a significant part in the drowning." There is no reason to treat medical-malpractice claims any differently in this regard. For example, even if an expert testified that a properly performed medical procedure will avoid a bad result 99 percent of the time, a jury could still conclude that the physician's negligence was more probably than not the cause of the bad result. See *post* at 36.

Second, Justice Markman's approach suggests that the factor distinguishing a medical-malpractice claim from a lost-opportunity claim is whether there is another possible cause of an injury, such as a preexisting condition. He states:

---

(…continued)

visual symptoms, and severe dry eye syndrome. *Id*. In sum, "[t]here are **never any guarantees** in medicine." *Id*. Within the realm of eye surgery alone, Justice Markman's rule would mean that any LASIK patient who experienced a loss of vision, debilitating visual symptoms, or severe dry eye syndrome would not be able to bring a traditional medical-malpractice claim simply because there was a chance, however slight, that those conditions would have occurred as a result of the properly performed LASIK procedure itself.

> . . . I conclude that a "lost opportunity" case is one in which it is at least possible that the bad outcome would have occurred even if the patient had received proper treatment. By contrast, if there is no question that the proper treatment would have resulted in a good outcome, then the patient who suffered a bad outcome has a traditional medical-malpractice action. [*Post* at 2.]

But this definition of a lost-opportunity case is contrary to both the doctrine as described by *Falcon* and the doctrine as adopted by the Legislature in MCL 600.2912a(2). The distinction between a lost-opportunity case and a medical-malpractice case does not pivot on a plaintiff's preexisting condition or the absolute certainty that proper medical treatment would have prevented the harm the plaintiff suffered. Rather, the determining factor is whether the plaintiff can prove, more probably than not, that the defendant's negligence caused physical harm. If a plaintiff can prove more-probable-than-not causation for physical harm, then he has a medical-malpractice claim for that injury. If not, he may have a claim for loss of opportunity to avoid harm, if he can prove that the defendant's negligence caused that injury: the loss of an opportunity to avoid harm. Of course, many lost-opportunity cases arise when a plaintiff has a preexisting condition that could have caused physical harm without negligence, but this is a correlation, not a cause. The fact that a plaintiff has a preexisting condition does not, by itself, cause a claim to be a lost-opportunity claim rather than a medical-malpractice claim. Similarly, the existence of other possible causes for a bad result does not determine the cause of action available to that plaintiff. Specifically, the possibility that a patient's disease or injury itself may have caused the bad result

19

does not mean that the patient cannot bring a traditional medical-malpractice claim.[9] Rather, as *Falcon* explained, traditional medical-malpractice claims require a plaintiff to show that the negligence more probably than not caused physical harm. *Falcon*, 436 Mich at 449. The Legislature adopted *Falcon*'s term "loss of opportunity" as well as the traditional more-probable-than-not standard of causation. Accordingly, there is no reason to conclude that the distinguishing feature between medical-malpractice claims and lost-opportunity claims is the existence of other possible causes of the harm, as Justice Markman appears to posit.

These faulty suppositions are significant, because they lead Justice Markman to endorse Dr. Roy Waddell's formula for calculating loss of opportunity. Waddell's formula purports to calculate a plaintiff's lost opportunity to survive by determining "what percent of patients who would die without treatment" could otherwise "be saved with treatment."[10] If proper treatment creates a greater than 50 percent chance of survival within the set of patients who

---

[9] Justice Markman offers the hypothetical treatment of a broken leg to show that his theory of traditional medical-malpractice claims is consistent with traditional causation principles. But he indicates just the opposite, by precluding a medical-malpractice claim unless administering proper treatment would never produce permanent damage. Assuming that a patient was treated, this requirement eliminates the possibility that another force (such as the natural progression of the broken leg itself), rather than negligence, caused the permanent damage to the leg.

[10] Waddell, *A doctor's view of "opportunity to survive"*: Fulton's *assumptions and math are wrong*, 86 Mich B J 32, 33 (March 2007).

would have died without treatment, then a cause of action exists. But Waddell's formula is flawed for several reasons. It operates from a mistaken understanding of a lost-opportunity case. The formula identifies plaintiffs who can show that negligence was more than a 50 percent cause of their death or physical harm. But that set of plaintiffs can, by definition, maintain a traditional cause of action for medical malpractice for the injury of death or physical harm itself. Accordingly, his formula would preclude true lost-opportunity plaintiffs from bringing claims and provide medical-malpractice claimants with lost-opportunity causes of action for which they have no need. Moreover, aside from its theoretical problems, the Waddell formula is blatantly inconsistent with the language of MCL 600.2912a(2).[11] It is inconceivable that Justice Markman can read the sentence "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the

_____

[11] Justice Markman opines that in the matter of MCL 600.2912a(2), "there is quite likely some disconnection between what the Legislature may have had in mind and what it actually enacted." *Post* at 15-16 n 15. Yet, despite appearing to believe that the Legislature's intent may not correlate to the words of MCL 600.2912a(2), Justice Markman is nevertheless convinced that he can discern the Legislature's intent from the statutory language. Further, he argues that the Waddell formula is consistent with the statutory language, even while conceding that the Legislature may not have had the concept that was later embodied in Waddell's formula specifically in mind when it enacted MCL 600.2912a(2). I think it is more than merely possible that the Legislature did not have this concept in mind when it crafted this law; notably, Waddell's article was not even published until 2007, long after the Legislature amended MCL 600.2912a(2) in 1993.

21

opportunity was greater than 50%" and conclude that it should be translated into this formula:

$$\frac{\text{(Premalpractice chance)} - \text{(Postmalpractice chance)}}{100 - \text{(Postmalpractice chance)}} \text{ x } 100$$

This formula has no basis in the language of MCL 600.2912a(2) or *Falcon*. MCL 600.2912a(2) simply requires that the opportunity was greater than 50 percent. Again, it is noteworthy that my interpretation does not require adding any inferred language to the statute. A plaintiff's premalpractice opportunity to survive or to achieve a better result must simply have been "greater than 50%." The approach taken by Justice Markman and Dr. Waddell requires this sentence to be rewritten to state that the plaintiff's opportunity to survive or to achieve a better result must have been decreased by 50 percent. See *post* at 12-14.

Finally, the Waddell approach leads to such anomalous results that it cannot possibly reflect the intention of the Legislature. The Legislature crafted MCL 600.2912a(2) as a reaction to *Falcon*, which permitted a lost-opportunity cause of action when the plaintiff's premalpractice opportunity to survive was 37.5 percent. As Justice Markman acknowledges, if a plaintiff dropped from a 99.99 percent premalpractice chance of survival to a 99.97 percent postmalpractice chance of survival, the Waddell formula would conclude that the plaintiff had experienced an actionable 66.67 percent loss of opportunity. On the other hand, recovery would be barred if a plaintiff dropped from a 60 percent premalpractice chance of survival to a 40 percent chance of survival, because the plaintiff would have

22

experienced only a 33 percent loss of opportunity. It is unlikely that the Legislature intended to compensate a loss of just 0.02 percentage points, while simultaneously precluding a loss of 20 percentage points. It is more likely that the Legislature disagreed with the threshold limit for lost-opportunity cases established by *Falcon*, 37.5 percent, and amended MCL 600.2912a(2) to raise the threshold to 50 percent.

RESPONSE TO CHIEF JUSTICE TAYLOR

While we reach different interpretations of MCL 600.2912a(2), I nevertheless agree with Justice Markman that Chief Justice Taylor errs by concluding that the second sentence of the statute is incomprehensible and unenforceable. I share Justice Markman's objection to the unprecedented approach Chief Justice Taylor has taken in concluding that this statute is unenforceable simply because it presents a complex matter of interpretation. While the fracture of this Court on this matter certainly illustrates the difficulty of interpreting this statute, I disagree that it compels the conclusion that the statute is unenforceable. And, in fact, Chief Justice Taylor's opinion paradoxically indicates that the statute will continue to be enforced unless the Legislature amends it, because the *Fulton* panel's interpretation will remain controlling law. *Ante* at 20 n 14.

CONCLUSION

I disagree with Chief Justice Taylor's conclusion that the second sentence of MCL 600.2912a(2) is incomprehensible and cannot be judicially enforced.

23

Therefore, I respectfully disagree with his analysis of that provision. However, I agree that the jury's verdict should be upheld, because plaintiff has presented evidence that supports a traditional medical-malpractice claim.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

S T A T E  O F  M I C H I G A N

SUPREME COURT

CARL STONE and NANCY STONE,

    Plaintiffs-Appellees,

v

                                                             No. 133986

DAVID A. WILLIAMSON, M.D., JACKSON
RADIOLOGY CONSULTANTS, P.C., and
W. A. FOOTE MEMORIAL HOSPITAL,

    Defendants-Appellants.

_____

MARKMAN, J. (*concurring in the result only*).

    We granted leave to appeal to address the proper interpretation of the second sentence of MCL 600.2912a(2), which states: "In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." Chief Justice Taylor's opinion concludes that this sentence is "substantially incomprehensible," and, therefore, "unenforceable." *Ante* at 2, 17, 20. Although this statutory language is by no means a model of clarity, I am in accord with Justice Cavanagh's opinion that the "lost opportunity" provision is enforceable. However, Justice Cavanagh concludes that the "lost opportunity" provision requires only that the patient's premalpractice chance to survive or obtain a better result be greater than 50 percent. Finally, he concludes that this is

not even a "lost opportunity" case. In these respects, I also disagree with his opinion.

Instead, I conclude that a "lost opportunity" case is one in which it is at least possible that the bad outcome would have occurred even if the patient had received proper treatment. By contrast, if there is no question that the proper treatment would have resulted in a good outcome, then the patient who has suffered a bad outcome has a traditional medical-malpractice action. In order for a traditional medical-malpractice plaintiff to prevail, he or she must prove that the bad outcome was more probably than not caused by the defendant's malpractice. In order for a "lost opportunity" plaintiff to prevail, he or she must prove that the "lost opportunity" to achieve a better result was more probably than not caused by the defendant's malpractice and that the "lost opportunity" was greater than 50 percent. In order to determine whether the "lost opportunity" was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance, the postmalpractice chance must then be subtracted from 100, the former number must be divided by the latter number, and then this quotient must be multiplied by 100 to obtain a percentage. If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail.

Because it is possible that the bad outcome in the instant case, i.e., amputation, would have occurred even if plaintiff had received proper treatment, given that there was some chance of amputation in the latter circumstance, this is a

2

"lost opportunity" action. Because plaintiff's "lost opportunity" was greater than 50 percent,[1] I would affirm the result reached by the Court of Appeals.

I. "LOST OPPORTUNITY"

A. COMMON LAW

This Court first recognized a "lost opportunity" claim in *Falcon v Mem Hosp,* 436 Mich 443; 462 NW2d 44 (1990). In *Falcon,* the plaintiff's expert witness testified that had the defendant physician not been negligent, the plaintiff's decedent would have had a 37.5 percent chance of surviving. Before *Falcon,* plaintiffs claiming medical malpractice were required to prove that the malpractice in fact caused the patient's physical harm. *Falcon,* 436 Mich at 448-449 (Levin, J.). Thus, in a wrongful-death case grounded in medical malpractice, the plaintiff was required to prove that the malpractice in fact caused the patient's death. In *Falcon,* the defendants argued that because the patient's premalpractice chance of survival was only 37.5 percent, the plaintiff could not prove that the malpractice caused the patient's death; the patient might very well have died even with proper treatment.

Although this Court agreed with the defendants that the plaintiff could not prove that the malpractice caused the patient's death, it nonetheless held that the plaintiff could prove that the malpractice caused the patient to suffer the loss of a

---

[1] $\dfrac{99 - 95}{100 - 95} \ \times \ 100 \ = 80\%$

3

37.5 percent opportunity to survive. *Id.* at 460. "In reducing [the patient's] opportunity of living . . ., her physician caused her harm, although it cannot be said . . . that he caused her death." *Id.* "We thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm" because a "patient goes to a physician precisely to improve his opportunities of avoiding, ameliorating, or reducing physical harm . . . ." *Id.* at 461. Thus, we recognized a "loss of an opportunity for a more favorable result, as distinguished from the unfavorable result [itself], as compensable in medical malpractice actions." *Id.*[2] "Under this approach, damages are recoverable for the loss of opportunity although the opportunity lost was less than even, and thus it is not more probable

---

[2] Justice Archer signed the lead opinion written by Justice Levin, and Justice Boyle wrote a concurring opinion, which Justice Cavanagh joined, that stated:

> I concur in the recognition of "lost opportunity to survive" as injury for which tort law should allow recovery in proportion to the extent of the lost chance of survival, *ante*, [436 Mich at] 466, provided that the negligence of the defendant more probably than not caused the loss of opportunity. However, I would emphasize that the Court today is called upon to decide the viability of a claim for "lost opportunity" only where the ultimate harm to the victim is death. Thus, any language in the lead opinion suggesting that a similar cause of action might lie for a lost opportunity of avoiding lesser physical harm is dicta. [*Falcon,* 436 Mich at 472-473 (Boyle, J., concurring).]

than not that the unfavorable result would or could have been avoided." *Id.* at 461-462.[3]

However, even "[u]nder this approach, the plaintiff must establish more-probable-than-not causation." *Id.* at 462. That is, the plaintiff "must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm." *Id.* Therefore, in both a traditional medical-malpractice action, in which the alleged injury is the physical injury itself, and a "lost opportunity" action, in which the alleged injury is the "lost opportunity" to achieve a better result, the plaintiff must prove that it is more probable than not that the defendant's malpractice caused the injury. In other words, the difference between these two causes of

---

[3] "[C]onsider the case in which a doctor negligently fails to diagnose a patient's cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a 30% chance of recovering from the disease and surviving over the long term. There are two ways of handling such a case. Under the traditional approach, this loss of a not-better-than-even chance of recovering from the cancer would not be compensable because it did not appear more likely [than] not that the patient would have survived with proper care. . . . A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than even. . . . While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure." [*Falcon,* 436 Mich at 462 n 26, quoting King, *Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences,* 90 Yale L J 1353, 1363-1364 (1981).]

5

action is not the standard of proof for causation, but the nature of the alleged injury.

This Court also held that the "lost opportunity" must be a "substantial" lost opportunity. *Id.* at 470. However, this Court did not define the parameters of a "substantial" lost opportunity other than to say that the "loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm." *Id.*[4] This Court explained that a "37.5 percent opportunity of living is hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore." *Id.* at 460.[5]

Finally, this Court held that "recovery should be allowed '*only* for the lost chance of survival.'" *Id.* at 471 (citation omitted) (emphasis in original). That is, the "'proper computation of damages would limit the damages recoverable to only that amount of reduced chance of recovery actually caused by the physician's negligent conduct.'" *Id.* at 472 n 47 (citation omitted). Therefore, we concluded that if the jury were to find that the physician's malpractice more probably than

---

[4] This Court expressly stated: "We need not now decide what lesser percentage would constitute a substantial loss of opportunity." *Falcon,* 436 Mich at 470 (Levin, J.).

[5] In *Falcon,* the patient's premalpractice chance of survival was 37.5 percent. The Court did not indicate what the patient's postmalpractice chance of survival was. It appears that the Court may simply have assumed, erroneously, that the patient's postmalpractice chance of survival was zero percent, given that the patient died. However, because somebody dies does not mean that the person had a zero percent chance of survival.

6

not had caused the patient to lose a 37.5 percent opportunity to survive, "37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages." *Id.* at 471.[6]

In *Weymers v Khera*, 454 Mich 639, 642; 563 NW2d 647 (1997), this Court refused to "recognize a cause of action for the loss of an opportunity to avoid physical harm less than death."[7] Although *Weymers* did not overrule *Falcon,* it

_____

[6] As Professor King has explained:

A better method of valuation would measure a compensable chance as the percentage probability by which the defendant's tortious conduct diminished the likelihood of achieving some more favorable outcome. . . .

To illustrate, consider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient's condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. Under the proposed rule, the plaintiff's compensation for the loss of the victim's chance of surviving the heart attack would be 40% of the compensable value of the victim's life had he survived . . . . [King, 90 Yale L J at 1382.]

[7] Although *Weymers* was decided after the Legislature enacted the statutory provision at issue in this case, the Court applied the common law rather than the statute because the alleged negligence occurred before the statute was enacted. It is also worth mentioning that *Weymers* refused to recognize a common-law claim for a "lost opportunity" to avoid physical harm less than death, although the statute expressly allows those claims. Finally, *Weymers* stated that "[o]ur Legislature immediately rejected *Falcon* and the lost opportunity doctrine." *Weymers,* 454 Mich at 649. For the reasons discussed later, I do not believe that this is entirely accurate.

7

clearly disagreed with *Falcon*[8] and "refuse[d] to extend *Falcon*." *Id.* at 649. In *Weymers,* the plaintiff's expert testified that "if defendants had given plaintiff proper care she would have had a thirty to forty percent chance of retaining the functioning of her kidneys." *Id.* at 644. However, the plaintiff did not receive proper care and her kidneys totally failed, requiring her to undergo a kidney transplant. Because the plaintiff's premalpractice chance to avoid kidney failure was not greater than 50 percent, *Weymers* held that she could not prove that the malpractice more probably than not caused her kidney failure. The Court refused to recognize a cause of action for the plaintiff's "lost opportunity" to avoid kidney failure.

In doing so, *Weymers*, in my judgment, mischaracterized the "lost opportunity" doctrine that had been developed in *Falcon*. *Weymers* stated: "The antithesis of proximate cause is the doctrine of lost opportunity," because the "lost opportunity doctrine allows a plaintiff to recover when the defendant's negligence possibly, i.e., a probability of fifty percent or less, caused the plaintiff's injury." *Id.* at 648. *Weymers* also accused the *Falcon* Court of "lower[ing] the standard of causation" and "allow[ing] [a plaintiff] to recover without establishing cause in fact." *Id.* at 650. Finally, *Weymers* stated that under the *Falcon* approach, "the

---

[8] That *Weymers* disagreed with *Falcon* explains why Justice Boyle, who concurred in *Falcon,* only concurred in the result reached in *Weymers* and why Justice Cavanagh, who joined Justice Boyle's concurrence in *Falcon,* dissented in *Weymers*. It is also interesting to note that the dissenting justice in *Falcon* was the authoring justice in *Weymers*.

plaintiff must show that there is a substantial possibility that the defendant's negligence caused his injury," and, thus, a plaintiff is allowed "to recover for his injury even though it was more likely than not that he would have suffered the injury if the defendant had not been negligent." *Id.* at 651.

Although *Weymers* noted that *Falcon* had "defined the injury as the loss of opportunity to avoid the harm, i.e., the death, rather than the harm itself," *Weymers* failed to recognize the significance of this distinction, as shown by its very next sentence, which stated that *Falcon*'s approach allows "'a plaintiff [to] receive[] compensation despite the greater probability that he or she would have suffered the injury even if the physician had used due care.'" *Id.* at 651 n 19 (citation omitted). This is further shown by the fact that the *Weymers* majority believed that it would have to "scrap[]" or "discard" causation in order to "recognize a cause of action for the loss of an opportunity to avoid physical harm less than death." *Id.* at 653.

However, as discussed earlier, *Falcon* did not lower the standard of causation when it adopted the "lost opportunity" doctrine. *Falcon,* 436 Mich at 462 (Levin, J.). Instead, it applied the same standard of causation, i.e., more probable than not, to a new type of injury, i.e., a "lost opportunity" to survive. *Id. Falcon* specifically held that a plaintiff bringing a "lost opportunity" claim "must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm." *Id.* Therefore, *Weymers* erred when it described the "lost opportunity" doctrine developed in *Falcon* as lowering the standard of causation.

9

## B. STATUTORY PROVISION

In 1993, three years after *Falcon* was decided, the Legislature enacted MCL 600.2912a(2), which provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Everybody agrees that this provision was enacted in response to this Court's decision in *Falcon.*

In *Wickens v Oakwood Healthcare Sys,* 465 Mich 53, 62; 631 NW2d 686 (2001), this Court held that "a living plaintiff may not recover for loss of an opportunity to survive on the basis of a decrease in her chances of long-term survival." The plaintiff's expert testified that the defendants' negligent one-year delay in diagnosing her breast cancer had caused plaintiff to suffer a reduction in her chances of surviving another 10 years. This Court relied on the first sentence of MCL 600.2912a(2), which states that a medical-malpractice plaintiff "has the burden of proving that he or she *suffered an injury* that more probably than not was proximately caused by the negligence of the defendant." (Emphasis added.) We held that this provision "expressly limits recovery to injuries that have already been suffered and more probably than not were caused by the defendant's malpractice." *Wickens,* 465 Mich at 60. "Thus, plaintiff can only recover for a

10

present injury, not for a potential future injury." *Id.*[9] Because the plaintiff in *Wickens* survived, she had not suffered a loss of an opportunity to survive. *Id.* That is, a person who survives cannot be said to have suffered a loss of an opportunity to survive. A person does not suffer a loss of an opportunity to survive until that person ceases to survive. Although we held that the surviving plaintiff in *Wickens* could not bring a claim for a loss of an opportunity to survive, this Court did hold that the plaintiff's claims that the delayed diagnosis resulted in the "need for more invasive medical treatments, emotional trauma, and pain and suffering" could proceed because she had already suffered those injuries. *Id.* at 61.

In *Fulton v William Beaumont Hosp,* 253 Mich App 70, 77-78; 655 NW2d 569 (2002), the Court of Appeals described the issue as,

> whether the second sentence of [MCL 600.2912a(2)] requires a plaintiff in order to recover for loss of an opportunity to survive to show only that the initial opportunity to survive before the alleged malpractice was greater than fifty percent, as argued by plaintiff, or, instead, that the opportunity to survive was reduced by greater than fifty percent because of the alleged malpractice, as argued by defendants.

The Court held that the language "the opportunity" was ambiguous, because it could be referring to the "initial opportunity" or it could be referring to the "loss of

---

[9] This statutory requirement is consistent with the common law. See, e.g., *Henry v Dow Chem Co*, 473 Mich 63, 75-76; 701 NW2d 684 (2005) (holding that "a plaintiff must demonstrate a present physical injury to person or property" in order to sustain a negligence claim).

opportunity." *Id.* at 80. However, because the Court believed that "MCL 600.2912a(2) was enacted to codify and increase the requirements [set forth in *Falcon*] for what constitutes a 'substantial loss of opportunity,'" *id.* at 82, quoting *Falcon,* 436 Mich at 470, and because *Falcon* "did not focus on the initial opportunity to survive, but focused on whether the decrease in the decedent's opportunity to survive was substantial," *Fulton,* 253 Mich App at 81, the Court chose the latter interpretation, *id.* at 83. That is, the Court held that the "lost opportunity," not just the initial opportunity, must "exceed 50 percent." *Id.*

I agree with this. The second sentence of MCL 600.2912a(2) reads: "In an action alleging medical malpractice, the plaintiff cannot recover for *loss of an opportunity* to survive or an opportunity to achieve a better result unless *the opportunity* was greater than 50%." (Emphasis added.) This sentence first refers to the "loss of an opportunity" and then to "the opportunity." In my judgment, the language "the opportunity" clearly refers back to the "loss of an opportunity." Therefore, the second sentence can reasonably be read to mean that the loss of the opportunity must be greater than 50 percent. In contrast, there is no reasonable means of reading the language "initial opportunity" into the sentence. Therefore, I agree with *Fulton*'s conclusion that the lost opportunity, not just the initial opportunity, must be greater than 50 percent.[10]

_____

[10] Contrary to Justice Cavanagh's contention, I do not believe I am reading words into the statute by concluding that MCL 600.2912a(2), which states that the "lost opportunity" must be greater than 50 percent, means that the patient's

(continued…)

12

The Court of Appeals in *Fulton* next concluded that because the plaintiff's premalpractice chance of survival was 85 percent and her postmalpractice chance of survival was 60 percent to 65 percent, her "lost opportunity" was 20 percent to 25 percent and, thus, because the plaintiff's "lost opportunity" was not greater than 50 percent, she could not recover under MCL 600.2912a(2). However, *Fulton* did not offer any explanation as to why it merely subtracted the postmalpractice chance from the premalpractice chance to determine the "lost opportunity." This might have been the correct method of determining the "lost opportunity" if MCL 600.2912a(2) required that such a loss be "greater than 50 percentage points." However, MCL 600.2912a(2) requires that the "lost opportunity" be "greater than 50%." There is a significant distinction between 50 percentage points and 50 percent. As Dr. Roy Waddell, a board-certified orthopedic surgeon in Grand Rapids, has explained: "A decrease in survival rate from 50 percent to 10 percent

---

(…continued)
opportunity to achieve a better result "must have been decreased by 50 percent." *Ante* at 22. If an opportunity has been "lost," the opportunity has obviously "decreased." Nor do I "misquote[e]" the statute, as Justice Cavanagh asserts. *Ante* at 12 n 5. I am cognizant that the statute states: "the plaintiff cannot recover for *loss of an opportunity* to survive or an opportunity to achieve a better result unless *the opportunity* was greater than 50%." MCL 600.2912a(2) (emphasis added). For the reasons already discussed, I believe that the phrase "the opportunity" obviously refers back to "loss of an opportunity." In contrast, I believe that Justice Cavanagh *is* reading words into the statute by concluding that MCL 600.2912a(2) means that the patient's "initial" chance of obtaining a better result must have been greater than 50 percent when the word "initial" cannot be found anywhere in the statutory provision. That is, while the language "*loss* of an opportunity" can be found in the statute, the language "*initial* opportunity" cannot be found in the statute.

13

is a 40-*percentage-point* decrease, but it is an 80 *percent* decrease." Waddell, *A doctor's view of "opportunity to survive"*: *Fulton's assumptions and math are wrong*, 86 Mich B J 32, 33 (March 2007) (emphasis in original). Similarly, a reduction in wages from $5 an hour to $1 an hour is not a 4 percent reduction in wages; rather, it is an 80 percent reduction in wages. See amicus curiae brief on behalf of Dr. Roy W. Waddell, pp 12-13.[11]

The other problem with *Fulton*'s method of calculating the "lost opportunity" is that it does not differentiate between those patients who would have survived regardless of whether they received proper or improper treatment and those patients who needed the proper treatment in order to survive.[12] Such a differentiation is necessary because only those in the latter group have truly suffered a "lost opportunity" as a result of the improper treatment. That is, if a patient would have survived regardless of whether he received proper or improper treatment, the improper treatment cannot be said to have caused him to lose an opportunity to survive. On the other hand, if the patient would have survived only

---

[11] Like the Court of Appeals in *Fulton*, Justice Cavanagh offers no explanation as to why he repeatedly calculates the "lost opportunity" in terms of the percentage points lost rather than the actual percentage lost when MCL 600.2912a(2) clearly states that the "lost opportunity" must be "greater than 50%," not greater than 50 percentage points. These statistical concepts are utterly distinct.

[12] Although I repeatedly refer to a lost "opportunity to survive," I recognize that MCL 600.2912a(2), unlike *Weymers*, 454 Mich at 642, also permits a cause of action for a lost "opportunity to achieve a better result."

14

if he had received the proper treatment, the improper treatment *can* be said to have caused him to lose an opportunity to survive. MCL 600.2912a(2) requires us to determine whether the patient more likely than not fell into the latter category rather than the former category, because the statute only allows a plaintiff to recover for a "loss of an opportunity" that was "greater than 50%" and that was "caused by the negligence of the defendant . . . ." Dr. Waddell's calculation does just that:

$$\frac{(\text{Premalpractice chance})^{13} - (\text{Postmalpractice chance})^{14}}{100 - (\text{Postmalpractice chance})}$$

The quotient resulting from this numerator and denominator is then multiplied by 100 to obtain a percentage.[15] This number must be "greater than 50%" in order to

---

[13] "Premalpractice chance" refers to the patient's premalpractice chance of survival or chance to achieve a better result. Waddell, 86 Mich B J at 33, refers to this as the "treated survival rate."

[14] "Postmalpractice chance" refers to the patient's postmalpractice chance of survival or chance to achieve a better result. Waddell, 86 Mich B J at 33, refers to this as the "untreated survival rate."

[15] Dr. Waddell's calculation may not be the only conceivable calculation for making the necessary determination under MCL 600.2912a(2), but, in my judgment, it constitutes a reasonable calculation that is in accord with the language of the statute. Moreover, I am cognizant that the Legislature may not specifically have had in mind the concept later embodied in Dr. Waddell's formula when it enacted MCL 600.2912a(2). However, it is the actual language of a statute to which this Court must ultimately be faithful. *People v Schaefer,* 473 Mich 418, 430; 703 NW2d 774 (2005) ("When interpreting a statute, it is the court's duty to give effect to the intent of the Legislature as expressed in the actual language used in the statute."). The instant case is one in which there is quite likely some disconnection between what the Legislature may have had in mind and what it
(continued…)

15

satisfy the requirement of the second sentence of MCL 600.2912a(2). For instance, if the patient's premalpractice chance to achieve a better result was 80 percent and, as a result of the defendant's malpractice, the patient's postmalpractice chance is reduced to 20 percent, the patient has suffered a 75 percent loss of an opportunity to survive.[16]

What the Waddell formula essentially does is test the sufficiency of the expert testimony, which is typically presented in the form of two statistics: the likelihood that a patient would have had a good outcome with proper treatment (the "treated survival rate") and the likelihood that a patient would have had a

---

(…continued)

actually enacted. In the end, though, it is the written law enacted by the Legislature that this Court interprets, not the Legislature's unstated intentions or the presumed thought processes of individual members of the Legislature.

Justice Cavanagh's amazement that I can "discern the Legislature's intent from the statutory language [of MCL 600.2912a(2)]," *ante* at 21 n 11, is quite remarkable, given that he purports to do exactly the same thing, albeit reaching a different conclusion. Indeed, seeking to discern intent from statutory language is generally what judges do when interpreting the law. He is also determined to make light of the fact that the Legislature could not have had "in mind" when crafting MCL 600.2912a(2) "the concept that was later embodied in Waddell's formula . . . ." *Ante* at 21 n 11. Although I recognize that the Legislature "may not specifically have had in mind" the concept underlying Dr. Waddell's formula, in essentially comparing premalpractice and postmalpractice opportunities in terms of percentages rather than percentage points, this formula is an altogether logical and commonsensical way of looking at "loss of opportunity" claims. Nonetheless, the only conclusion I reach in this opinion is that, whatever was in the recesses of Senator A's or Representative B's minds in the Legislature, they and their colleagues crafted a statute that is consistent with Dr. Waddell's formula and inconsistent with Justice Cavanagh's interpretation.

[16] $\dfrac{80 - 20}{100 - 20} \times 100 = 75\%$

---

good outcome with negligent treatment (the "untreated survival rate"). The Waddell formula allows a court analyzing this data to determine whether the plaintiff, when the patient has experienced a bad outcome, has created a question of material fact concerning whether proper treatment more likely than not would have made a difference. The formula does this by identifying the universe of patients who would have had a bad outcome (the denominator) and the subset of those patients who could have been favorably treated (the numerator).

It is easiest to start with the formula's denominator. This denominator consists of the universe of all patients who would have had a bad outcome, for whatever reason. This group includes two subsets of patients: those who would have had a bad outcome because they received negligent treatment, and those who would have had a bad outcome despite receiving proper treatment. The formula identifies this group by subtracting from 100 the percentage of patients who would have had a good outcome even without proper treatment; in other words, it subtracts the "untreated survival rate" from 100. In this way, a court can take the expert's statistics and identify those patients who were not treated properly and who experienced a bad outcome. A patient who is the subject of a medical-malpractice action is a member of this group. But we cannot determine whether the patient is a member of this group because he or she was denied the proper treatment or because he or she would have suffered a bad outcome even with proper treatment.

One more calculation must then be made in order to answer the dispositive question posed by the statute: whether it is more likely than not that the patient would have benefited from proper treatment or, put another way, whether the "opportunity to survive or . . . to achieve a better result" was "greater than 50%." MCL 600.2912a(2). A court has to determine what percentage of those patients with a bad outcome (those patients in the denominator) would have benefited from treatment. This brings us to the Waddell formula's numerator. The numerator consists of those patients who would have had a bad outcome only if they had been negligently treated. It is calculated by subtracting the "untreated survival rate" from the "treated survival rate," thus identifying those patients who required treatment to avoid a bad outcome.

Once the numerator and denominator have been calculated, comparison of these two numbers by their quotient allows a court to reasonably determine whether improper treatment more likely than not made a difference in the patient's outcome. If the number of patients who would have had a bad outcome only if they had been negligently treated (the numerator) comprises more than half of the number of patients who would have had a bad outcome overall (the denominator), then the plaintiff has established that proper treatment more likely than not would have made a difference. In other words, when this has been shown, the plaintiff has created a question of material fact concerning whether the "opportunity"-- the benefit that would have been realized by a group of patients from the treatment that was not given to this specific patient-- was greater than 50 percent. Such a

18

plaintiff has presented adequate expert testimony to establish a "lost opportunity" cause of action within the meaning of the statute.

As Dr. Waddell has explained:

[T]he intent of the law is to disallow damages unless it can be shown that *proper treatment creates a better than even* ("greater than 50%") *chance of survival of the patients who would have died without treatment*. In other words, if appropriate treatment *cannot* save at least half of the patients who otherwise would have died, then you do not have sufficient evidence to show that the negligence made the difference in the adverse outcome (death). Conversely, if good treatment *can* save more than half of the patients who otherwise would have died, then you have adequate evidence that the poor treatment or negligence was likely to blame for the bad outcome. This is exactly what this definition of opportunity measures. [Waddell, 86 Mich B J at 33 (emphasis in original).]

MCL 600.2912a(2) only allows a plaintiff to recover for a "loss of an opportunity" that was "greater than 50%" and that was "caused by the negligence of the defendant . . . ." Use of Dr. Waddell's formula, which generates the actual percentage lost rather than the number of percentage points lost, and excludes those who would have achieved a good result regardless of the malpractice, best ensures, in my judgment, that these statutory requirements are satisfied. That is, this calculation would impose liability, in accordance with MCL 600.2912a(2), in those instances in which the medical care received more likely than not affected whether the patient survived.[17]

---

[17] I acknowledge that the Waddell approach appears to lead to anomalous results in those situations in which there is only a slight loss of an opportunity. For example, as defendants point out, if the premalpractice chance of survival was 99.99 percent and the postmalpractice chance was 99.97 percent, the "lost

(continued…)

## II. APPLICATION

Plaintiff's premalpractice chance to obtain a better result was 99 percent, and his postmalpractice chance of obtaining a better result was 95 percent. Pursuant to the Waddell calculation, plaintiff lost an 80 percent opportunity to achieve a better result:

$$\frac{99 - 95}{100 - 95} \quad x \quad 100 \quad = 80\%$$

Therefore, plaintiff's "lost opportunity" was "greater than 50%." Accordingly, plaintiff satisfied the requirements of MCL 600.2912(a)(2). Therefore, I would affirm the result of the Court of Appeals judgment.[18]

_____

(…continued)
opportunity" would be 66.67 percent. Possibly, this would not constitute a practical problem, because experts are not generally able to predict opportunities with this degree of precision. See, e.g., *Falcon,* 436 Mich at 449 n 5 (Levin, J.) ("'Human nature being what it is, and the difference between scientific and legal tests for "probability" often creating confusion, for every expert witness who evaluates the lost chance at 49% there is another who estimates it at closer to 51%'") (citation omitted). Nonetheless, if the Legislature wants to avoid the possibility of such an anomalous result, it could require, for example, that there be a threshold *percentage-point* loss as a result of the defendant's malpractice, say 5 or 10 percentage points, in addition to the requirement of the loss being "greater than 50%." Finally, I would emphasize that I am neither advocating for nor against the Waddell calculation as a matter of fairness or sound public policy; I simply believe that it is in accordance with the Legislature's directions in MCL 600.2912a(2).

[18] Although, for the reasons discussed above, I agree with the result reached by the Court of Appeals, I respectfully disagree with its calculation of the "lost opportunity." In addition, I disagree with its conclusion that *all* the risks to which the patient was exposed should be considered when determining the patient's "lost opportunity." Instead, I believe that *only* those risks associated with the injuries that the patient actually suffered should be considered, since the whole point of a
(continued…)

20

## III. RESPONSE TO CHIEF JUSTICE TAYLOR

Chief Justice Taylor's opinion concludes that the second sentence of MCL 600.2912a(2) is "substantially incomprehensible," and, therefore, "unenforceable." *Ante* at 2, 17, 20.[19]   Although he does not expressly rely on the "void for vagueness" doctrine, he is apparently doing just that, because I am unaware of any other doctrine that would allow a court to conclude that a statutory provision is "unenforceable" on the basis that it is "substantially incomprehensible."  The enactments of the Legislature are, as a rule, enforceable in the courts of this state absent a violation of the Michigan or the United States constitutions.

The "void for vagueness" doctrine derives from the Due Process Clause. "'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'"  *People v Howell,* 396 Mich 16, 20 n 4; 238

---

(…continued)

negligence action is to establish that the defendant's negligence caused a specific injury.  That the negligence could possibly have caused *other* injuries is just not relevant.  Further, only considering the risks associated with the injuries actually suffered is consistent with our decision in *Wickens*, 465 Mich at 54, 61, in which we held that "a living person may not recover for loss of an opportunity to survive," because "a loss of opportunity to survive claim only encompasses injuries already suffered . . . ."  Therefore, the risk of death cannot be considered when the plaintiff did not actually die.

Moreover, as discussed above, plaintiff's recovery should have been limited to 80 percent of the damages calculated, given that plaintiff suffered the loss of an 80 percent opportunity, not a 100 percent opportunity.  However, given that it does not appear that defendants ever raised this issue, I would not remand to the trial court on this basis.

[19] In similar fashion, his opinion states that MCL 600.2912a(2) "cannot be interpreted as written," that it "create[s] a paradox," and that the second sentence of the statute "impossibly conflicts" with the first sentence.  *Ante* at 12, 14, 16.

21

NW2d 148 (1976), quoting *Grayned v City of Rockford,* 408 US 104, 108; 92 S Ct

2294; 33 L Ed 2d 222 (1972). "The void-for-vagueness doctrine reflects the

principle that 'a statute which either forbids or requires the doing of an act in

terms so vague that [persons] of common intelligence must necessarily guess at its

meaning . . . violates the first essential of due process of law.'" *Roberts v United*

*States Jaycees,* 468 US 609, 629; 104 S Ct 3244; 82 L Ed 2d 462 (1984), quoting

*Connally v Gen Constr Co*, 269 US 385, 391; 46 S Ct 126; 70 L Ed 2d 322 (1926).

However,

> "this prohibition against excessive vagueness does not invalidate
> every statute which a reviewing court believes could have been
> drafted with greater precision. Many statutes will have some
> inherent vagueness, for '[in] most English words and phrases there
> lurk uncertainties.' Even trained lawyers may find it necessary to
> consult legal dictionaries, treatises, and judicial opinions before they
> may say with any certainty what some statutes may compel or
> forbid. All the Due Process Clause requires is that the law give
> sufficient warning that men may conduct themselves so as to avoid
> that which is forbidden." [*People v Petrella,* 424 Mich 221, 255;
> 380 NW2d 11 (1985) (citations omitted).]

The "void for vagueness" doctrine serves three related interests:

> "First, because we assume that man is free to steer between
> lawful and unlawful conduct, we insist that laws give the person of
> ordinary intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly. Vague laws may trap the
> innocent by not providing fair warning. Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them. A vague law
> impermissibly delegates basic policy matters to policemen, judges,
> and juries for resolution on an *ad hoc* and subjective basis, with the
> attendant dangers of arbitrary and discriminatory application. Third,
> but related, where a vague statute 'abut[s] upon sensitive areas of
> basic First Amendment freedoms,' it 'operates to inhibit the exercise

22

of [those] freedoms.'" [*Howell,* 396 Mich at 20 n 4, quoting *Grayned,* 408 US at 108-109.]

I would add that the "void for vagueness" doctrine also ensures that the "judicial power" of this state, see Const 1963, art 6, § 1, is not inappropriately exercised by "interpreting" a statute whose language is simply not susceptible to reasonable interpretation; an attempt to give meaning to such a statute will inevitably devolve into a legislative or policy-making determination on the part of a branch of government whose responsibilities do not entail such determinations.

The "void for vagueness" doctrine has generally been held applicable only to criminal statutes or to laws infringing First Amendment freedoms. Indeed, to the best of my knowledge, this Court has *never* struck down a civil statute that does not implicate First Amendment freedoms under the "void for vagueness" doctrine. Chief Justice Taylor's opinion cites no Michigan or federal case-law to the contrary. Nor can any support for his conclusion be found in any of the parties' briefs or the numerous amicus curiae briefs filed in this Court. Indeed, not one of those briefs even suggests that the "lost opportunity" provision in MCL 600.2912a(2) is unconstitutionally vague.

This Court has held that a,

statute may be challenged for vagueness on the grounds that it

—is overbroad, impinging on First Amendment freedoms, or

—does not provide fair notice of the conduct proscribed, or

—is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has

23

been committed. [*Woll v Attorney General,* 409 Mich 500, 533; 297 NW2d 578 (1980).]

Chief Justice Taylor's opinion does not indicate on which of these grounds it finds the "lost opportunity" provision to be unconstitutionally vague. The first ground certainly is not pertinent, because the "lost opportunity" provision does not impinge on any First Amendment freedoms. Neither of the other two grounds seems to be pertinent either, as both seem to pertain to criminal offenses, given that the second ground refers to "the conduct proscribed" and the third ground refers to "whether an offense has been committed." The "lost opportunity" provision neither "proscribe[s]" conduct nor confers "unlimited discretion on the trier of fact to determine whether an offense has been committed." Therefore, there does not seem to be any basis under our current case-law to strike down the "lost opportunity" provision as being unconstitutionally vague. Chief Justice Taylor should, at the least, explain and justify his extension of this doctrine, which enables this Court to strike down an enactment of the Legislature.

In *A B Small Co v American Sugar Refining Co,* 267 US 233; 45 S Ct 295; 69 L Ed 589 (1925), the United States Supreme Court held that a buyer could not elude a contract to purchase refined sugar on the basis that the seller was charging an "unjust" or "unreasonable" price in violation of a federal statute, because the federal statute was unconstitutionally vague. It is noteworthy that although *American Sugar* involved a civil breach-of-contract action, the statutory language invalidated was a criminal statute. However, even putting that aside, the Court

24

held that the provision was unconstitutionally vague because it required people to "conform to a rule or standard which was so vague and indefinite that no one could know what it was." *Id.* at 238-239. That is, it was so "indefinite as to be unintelligible . . . ." *Id.* at 240. In order for something to be "unintelligible," it must be "not capable of being understood." *Random House Webster's College Dictionary* (1991). As discussed throughout this opinion, I simply do not believe that the provision at issue is incapable of being understood. MCL 600.2912a(2) may conceivably be unwise or imprudent, it could conceivably have been drafted with greater clarity and precision, and its interpretation may require an unusual investment of judicial effort, but it is not incapable of being understood.

In *Exxon Corp v Busbee,* 644 F2d 1030, 1031 (CA 5, 1981), the United States Court of Appeals for the Fifth Circuit held that a state commercial regulatory statute was not unconstitutionally vague, because it was not "'impossible to divine.'" (Citation omitted.) That court explained that "[b]ecause the statute is not concerned with either the first amendment or the definition of criminal conduct, . . . we must be lenient in evaluating its constitutionality." *Id.* at 1033. It further explained that "uncertainty in this statute is not enough for it to be unconstitutionally vague; rather, it must be *substantially incomprehensible*." *Id.* (emphasis added).[20] Finally, the court indicated that "the parties themselves have

---

[20] Although Chief Justice Taylor does not expressly state that he believes MCL 600.2912a(2) to be unconstitutionally vague, he uses the identical language--
(continued…)

25

offered possible interpretations" of the provision," and then concluded that "[t]hese attempts at statutory construction illustrate that [the provision] is, while most assuredly not a 'model of clarity,' at least amenable to some sensible construction." *Id.* at 1034 (citation omitted). Because I conclude that the "lost opportunity" provision at issue in the instant case is likewise "amenable to some sensible construction," I strongly disagree with Chief Justice Taylor's conclusion that this provision should be struck down on the grounds of vagueness.

Furthermore, I must emphasize the well-established rule that "this Court will presume that all legislation is constitutional and will attempt to construe legislation so as to preserve its constitutionality[.]" *People v Neumayer,* 405 Mich 341, 362; 275 NW2d 230 (1979).

> No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature are to be presumed constitutional until the contrary is shown; and it is only when they *manifestly* infringe some provision of the constitution that they can be declared void for that reason. In cases of doubt, every possible presumption, not clearly inconsistent with the language and the subject matter, is to be made in favor of the constitutionality of the act. [*Sears v Cottrell*, 5 Mich 251, 259 (1858) (emphasis in original).]

"We are duty bound under the Michigan Constitution to preserve the laws of this state . . . ." *People v Bricker,* 389 Mich 524, 528; 208 NW2d 172 (1973). Therefore, "courts [must] construe the language of a statute so as to give it effect

---

(…continued)
"substantially incomprehensible"-- that the *Exxon* Court used when addressing whether a statutory provision was unconstitutionally vague.

rather than to nullify it." *Petrella,* 424 Mich at 241. "Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity." *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). "We exercise the power to declare a law unconstitutional with extreme caution . . . ." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004). Therefore, "every statute passed by the Legislature is presumed to be constitutional, and a reviewing court should find an act invalid only when there is no reasonable interpretation which will sustain it." *State Treasurer v Wilson*, 423 Mich 138, 146; 377 NW2d 703 (1985). "Indeed, although the presumption is not conclusive, it is powerful enough to permit even a strained construction when necessary to save constitutionality." *Williams v Hofley Mfg Co*, 430 Mich 603, 613; 424 NW2d 278 (1998) (citations omitted); see also *Osborn v Charlevoix Circuit Judge*, 114 Mich 655, 660; 72 NW 982 (1897) ("There is always a presumption in favor of constitutionality, and this presumption justifies a construction which is rather against the natural interpretation of the language used, if necessary to sustain the law.").

"[D]eclaring a statute unconstitutional is '"the gravest and most delicate duty that this Court is called on to perform"' . . . ." *People v Lynch,* 410 Mich 343, 352; 301 NW2d 796 (1981) (citation omitted). Although I do not necessarily agree that we are obligated to adopt interpretations that are "strained," *Williams,*

27

430 Mich at 613, or "against the natural . . . language," *Osborn*, 114 Mich at 660, I do not believe that the interpretation of MCL 600.2912a(2) set forth in this opinion comes anywhere close to such boundaries. I simply do not think that Chief Justice Taylor's opinion sufficiently perseveres to avoid the declaration of unconstitutionality that he apparently reaches.[21]

Chief Justice Taylor's opinion concludes that MCL 600.2912a(2) is unenforceable because the two sentences in that provision are inconsistent with one another. Once again, I disagree. Chief Justice Taylor states that under the first sentence of MCL 600.2912a(2), a plaintiff must prove that the defendant's malpractice caused the injury, while under the second sentence, a plaintiff cannot prove that the defendant's malpractice caused the injury. What he fails to recognize is that in a "lost opportunity" action, the injury is not the death or the

---

[21] It is also noteworthy that this Court has repeatedly made it clear that "ambiguity is a finding of last resort," because a finding of ambiguity,

> enables an appellate judge to bypass traditional approaches to interpretation and either substitute presumptive "'rule[s] of policy,'" see *Klapp v United Ins*, 468 Mich 459, 474; 663 NW2d 447 (2003), quoting 5 Corbin, Contracts (rev ed, 1998), § 24.27, p 306, or else to engage in a largely subjective and perambulatory reading of "legislative history." [*Lansing Mayor v Pub Service Comm,* 470 Mich 154, 164-165 and n 6; 680 NW2d 840 (2004).]

Yet, in this case, Chief Justice Taylor not only concludes that the statute is ambiguous, but essentially concludes that it is unconstitutionally vague and, therefore, null and void.

28

physical harm, but the "lost opportunity" to avoid the death or physical harm,[22] and that a "lost opportunity" plaintiff *does* have to prove that the defendant's malpractice more probably than not caused *this* injury. As we explained in *Falcon,* 436 Mich at 461 (Levin, J.): "We thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm." However, even "[u]nder this approach, the plaintiff must establish more-probable-than-not causation." *Id.* at 462. That is, the plaintiff "must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm." *Id.* Therefore, in both a traditional medical-malpractice action, in which the alleged injury is the

_____

[22] Chief Justice Taylor's opinion contends that pursuant to *Wickens,* 465 Mich at 60-61, the injury in a "lost opportunity" action must be the death or the physical harm, not the "lost opportunity" to avoid the death or the physical harm. I disagree. In *Wickens,* this Court simply held that a surviving plaintiff has not lost an opportunity to survive. That is, a surviving plaintiff cannot recover damages for the possibility that he or she may die sometime in the future. There must be a present injury. Therefore, in a "lost opportunity to survive" action, the patient must have failed to survive; and, in a "lost opportunity to achieve a better result" action, the patient must have failed to achieve the better result. Those plaintiffs who survived, and those who achieved the better result, have simply suffered no "lost opportunity" at all, and thus have no grounds on which to seek a recovery. However, those patients who did not survive, and those patients who did not achieve a better result, *do* have a present injury, even though the plaintiffs in those cases cannot prove that the defendant's malpractice caused the death or the physical harm, and these plaintiffs can recover as long as they can prove that the defendant's malpractice caused the patients to lose an opportunity to survive or achieve a better result and that the "lost opportunity" was greater than 50 percent. Contrary to Chief Justice Taylor's contention, *Falcon,* 436 Mich at 470 (Levin, J.), did not allow for the recovery of the same kind of injury that *Wickens* precluded. In *Falcon,* unlike in *Wickens,* the patient did not survive and thus did suffer a "lost opportunity to survive."

death or the physical harm itself, and in a "lost opportunity" action, in which the alleged injury is the "lost opportunity" to avoid the death or the physical harm, the plaintiff must prove that it is more probable than not that the defendant's malpractice caused the injury.

Contrary to Chief Justice Taylor's contention, then, the two sentences in MCL 600.2912a(2) are not inconsistent. Pursuant to the first sentence, all medical-malpractice plaintiffs must prove that the defendant's malpractice more probably than not caused the alleged injury. Pursuant to the second sentence, a "lost opportunity" plaintiff must prove that the "lost opportunity" was greater than 50 percent. Therefore, in order to satisfy both sentences, a "lost opportunity" plaintiff must prove that the defendant's malpractice more probably than not caused the "lost opportunity" *and* that the "lost opportunity" was greater than 50 percent. There is nothing inconsistent about these sentences.

However, there *is* something inconsistent about Chief Justice Taylor's opinion. He concludes that the second sentence of MCL 600.2912a(2) is so "substantially incomprehensible" that it is "unenforceable." *Ante* at 2, 17, 20. Yet, despite this conclusion, he repeatedly asserts that when the Legislature enacted the second sentence of MCL 600.2912a(2) it "intended" certain things. See, e.g., a*nte* at 13-14, where the he states that the Legislature "intended" the "lost opportunity" provision to apply to "situation[s] in which an injury might have occurred anyway, but in which the defendant's act or omission hastened or worsened it in such a way that the plaintiff suffered more severe physical injury

30

than he or she would have had the negligence not occurred," and *ante* at 18, where he states that "the Legislature intended to retain the traditional proximate-cause requirement in effect before *Falcon* . . . ."[23] If this provision is so vague-- indeed of a constitutional dimension, as Chief Justice Taylor's opinion essentially concludes-- how can he be so certain what the Legislature intended by it? Either we know what the Legislature intended by this provision or we do not; Chief Justice Taylor cannot have it both ways.

## IV. RESPONSE TO JUSTICE CAVANAGH

In his opinion, Justice Cavanagh concludes that the second sentence of MCL 600.2912a(2) requires only that the patient's premalpractice chance to obtain a better result be greater than 50 percent. As explained earlier, I agree with him that the phrase "the opportunity" in MCL 600.2912a(2) refers back to the language "loss of an opportunity."[24] However, I disagree with his conclusion that "loss of an opportunity" refers to the patient's premalpractice chance to obtain a better result. Instead, I believe that "loss of an opportunity" clearly refers to the

_____

[23] Chief Justice Taylor's opinion contends that the Legislature intended to abolish "lost opportunity" claims. I agree with Justice Cavanagh's opinion that if that was the Legislature's intent, it would have simply prohibited plaintiffs from bringing "lost opportunity" claims, rather than merely adding a provision that imposes an additional requirement on "lost opportunity" plaintiffs.

[24] At one point, Justice Cavanagh asserts that the phrase "the opportunity" refers back to the language "loss of an opportunity" and, thus, that they "are to be construed identically," *ante* at 11; however, at another point, he asserts that my proposed meaning of "the opportunity" would inappropriately read the words "loss of" into the provision, *ante* at 12. These assertions are simply incompatible.

opportunity that the patient actually lost as a consequence of the defendant's malpractice. MCL 600.2912a(2) states that "the plaintiff cannot *recover* for loss of an opportunity . . . unless the opportunity was greater than 50%." (Emphasis added.) That is, the opportunity that MCL 600.2912a(2) refers to is the "lost opportunity" for which the plaintiff may "recover." The plaintiff cannot necessarily recover for the entire premalpractice chance to obtain a better result; instead, he or she can only recover for the portion of the premalpractice chance that was actually lost. Justice Cavanagh's opinion states that "the opportunity alleged to have been lost must be the premalpractice opportunity." *Ante* at 11 (emphasis added). This is plainly incorrect. Instead, the chance alleged to have been lost *may* be the entire premalpractice chance; however, it *may also* be only a portion of the premalpractice chance, as in the instant case in which plaintiff's opportunity to obtain a better result was reduced from 99 percent to 95 percent. Justice Cavanagh seems to recognize this, because he states that "the premalpractice opportunity . . . is the opportunity that is lost *in some measure . . . .*" *Ante* at 11 (emphasis added). In fact, at one point, he seems to reach the same conclusion that I do-- "a plaintiff cannot recover for the loss of an opportunity unless *the* opportunity-- the premalpractice opportunity that was allegedly lost in some measure-- was greater than 50 percent." *Ante* at 11 (emphasis in original). That is, the portion of the premalpractice opportunity that was lost must be greater than 50 percent. However, at other points, he states

32

inconsistently that the word "opportunity" refers only to the premalpractice opportunity. *Ante* at 11.

Justice Cavanagh's opinion also contends that "MCL 600.2912a(2) cannot limit recovery for the loss of an opportunity to cases in which the loss was greater than 50 percent, because any plaintiff who satisfied that condition would have a traditional medical-malpractice claim for the death or physical harm itself." *Ante* at 13. Justice Cavanagh similarly contends that Dr. Waddell's "formula would preclude true lost-opportunity plaintiffs from bringing claims and provide medical-malpractice claimants with lost-opportunity causes of action for which they have no need." *Ante* at 21. These contentions, I believe, are incorrect. For example, in the instant case, although, pursuant to Dr. Waddell's formula, plaintiff suffered the loss of an 80 percent opportunity to achieve a better result, i.e., no amputation, plaintiff cannot prove that defendants' malpractice caused the amputation, as he would be required to do in a traditional medical-malpractice action. He cannot prove that defendants' malpractice caused the amputation because there was at least a 1 percent chance that plaintiff would have suffered an amputation even with proper treatment. However, plaintiff *did* prove that defendants' malpractice caused him to suffer the loss of an 80 percent opportunity to achieve a better result, i.e., no amputation. Therefore, contrary to Justice Cavanagh's contention, it is possible to have a situation in which the "lost opportunity" exceeds 50 percent, but the plaintiff cannot satisfy the requirements of a traditional medical-malpractice action, and Dr. Waddell's formula identifies

33

those plaintiffs who cannot satisfy the requirements of a traditional medical-malpractice action but who can satisfy the "lost opportunity" requirements of MCL 600.2912a(2).[25]

---

[25] Although Justice Cavanagh states that he disagrees with my distinction between a "lost opportunity" action and a traditional medical-malpractice action, at other points in his analysis he seems to agree with it. For instance, he states that a plaintiff would not be able to recover for the patient's death in a traditional medical-malpractice action if the patient only had a 40 percent premalpractice chance of survival, because the plaintiff "would not be able to prove that the physician's malpractice more probably than not . . . caused the patient's death" since "[t]here was a 60 percent chance that the patient would have died regardless of the malpractice, as a result of the preexisting condition. But the plaintiff might be able to show that the physician's malpractice more probably than not caused the patient to lose up to a 40 percent chance of avoiding death," i.e., recover for the "lost opportunity" in a "lost opportunity" action. *Ante* at 8-9. This is precisely the distinction that I make between "lost opportunity" actions and traditional medical-malpractice actions.

Yet at other points Justice Cavanagh seems to misunderstand my distinction between "lost opportunity" actions and traditional medical-malpractice actions. For instance, he states that my distinction must be wrong because we have long held that the medical malpractice does not have to be the sole cause of the injury in order for a medical-malpractice plaintiff to prevail. *Ante* at 13-14 n 6, 17-20. However, my distinction is not inconsistent with this holding. To the contrary, I agree with Justice Cavanagh that the medical malpractice does not have to be the sole cause of the injury. For example, if Bill broke Tom's leg and Dr. Jones committed medical malpractice in treating Tom's broken leg, resulting in permanent damage to Tom's leg, Tom may still be able to prevail in a traditional medical-malpractice action for the permanent damage to his leg. He would be able to prevail in such an action if proper treatment would not have resulted in permanent damage. However, if there was a chance that Tom's leg would have been permanently damaged even with proper treatment, then Tom would only be able to recover for his "lost opportunity" of avoiding the permanent damage. Contrary to Justice Cavanagh's contentions, my analysis would not "preclude plaintiffs with preexisting conditions that might have contributed *slightly* to their injuries from bringing medical-malpractice claims"; it would not "preclude medical-malpractice claims from arising in situations in which proper medical treatment does not *always* succeed"; and it would not "preclud[e] a medical-
(continued…)

malpractice claim unless administering proper treatment would never produce permanent damage." *Ante* at 17, 20 n 9 (emphasis in original). Furthermore, I agree with Justice Cavanagh that the "fact that a plaintiff has a pre-existing condition does not, by itself, cause a claim to be a lost-opportunity claim rather than a [traditional] medical-malpractice claim." *Ante* at 19. As explained above, even though Tom had a pre-existing condition, i.e., a broken leg, Tom would still have a traditional medical-malpractice action if proper treatment would not have resulted in permanent damage.

Finally, Justice Cavanagh concludes that the instant case is not a "lost opportunity" cause of action. *Ante* at 16. However, this seems to be inconsistent with his *own* definition of a "lost opportunity" cause of action. He defines a "lost opportunity" action as one in which the "lost opportunity" was not greater than 50 percent. *Ante* at 8-10 and n 2, 13-15. He calculates this "lost opportunity" by subtracting the postmalpractice chance of obtaining a better result from the premalpractice chance. *Ante* at 8-10 and n 2, 13-15. In the instant case, the premalpractice chance was 99 percent and the postmalpractice chance was 95 percent. Therefore, pursuant to Justice Cavanagh's *own* formula, plaintiff's "lost opportunity" was 4 percent. Given that plaintiff's "lost opportunity" was less than 50 percent, I do not understand why he concludes that this is not a "lost opportunity" cause of action. Further, I do not understand why he believes that this plaintiff should prevail, given his conclusion that MCL 600.2912a(2) simply codified *Falcon* and added the requirement that the premalpractice chance must be greater than 50 percent. As Justice Cavanagh explains, *Falcon* held that the "lost opportunity" must be "substantial." *Ante* at 5, quoting *Falcon,* 436 Mich at 470 n 43 (Levin, J.). Does Justice Cavanagh believe that a 4 percent "lost opportunity" is "substantial"? Justice Cavanagh, *ante* at 16 n 7, attempts to avoid this dilemma by making the same mistake as the Court of Appeals, i.e., considering *all* potential risks rather than only those risks associated with the injury actually suffered by plaintiff. See n 18 *supra*. For example, given that plaintiff did not die, it is inappropriate to take into consideration, as Justice Cavanagh does, the fact that plaintiff's *risk* of death increased as a result of the medical malpractice. *Id.* Contrary to Justice Cavanagh's contention, not considering plaintiff's increased risk of death does not "penalize[] [plaintiff] for managing to survive," *ante* at 16 n 7; it simply does not calculate his entitlement to a recovery in malpractice on the basis of a death that he never suffered. I cannot comprehend why Justice Cavanagh thinks that considering an increased *risk* of death is "relevant to the jury's determination of whether malpractice [has] caused a plaintiff to suffer a *particular* harm," *ante* at 16 n 7 (emphasis added), when the "particular harm" actually suffered was other than death.

35

In order to satisfy traditional medical-malpractice action requirements, there must be no question that the proper treatment would have resulted in a good outcome (at least with regard to the specific injury suffered by the patient), because if there is any chance that a patient who received proper treatment might nevertheless have suffered the specific bad outcome ultimately suffered by the patient, it cannot be proved that the improper treatment caused the bad outcome. If there is any chance that the proper treatment could have resulted in the bad outcome, the chances of a good outcome with proper treatment and the chances of a good outcome with improper treatment must be compared. That is, under those circumstances, although the plaintiff cannot prove that the defendant's malpractice caused the bad outcome because the bad outcome might have occurred even with proper treatment, the plaintiff may be able to prove that the defendant's malpractice increased the patient's chances of obtaining a bad outcome and, thus, caused him or her to suffer a "lost opportunity" to achieve a better result. This is the only coherent concept of a "lost opportunity" cause of action under MCL 600.2912a(2).[26]

---

[26] Given that (a) Chief Justice Taylor's analysis would render the "lost opportunity" provision null and void, (b) Justice Cavanagh's analysis is inconsistent and incompatible with the language of the statute, and (c) the analysis in this opinion has no votes other than my own, I urge the Legislature to revisit MCL 600.2912a(2) at its earliest opportunity. If the Legislature wishes to maintain the "lost opportunity" doctrine, it should enact a provision that indicates such an intention, and that sets forth in as clear a manner as possible the requirements a "lost opportunity" plaintiff must satisfy. The fractionalization of this Court in the instant case suggests that this has not been achieved by the

(continued…)

V. CONCLUSION

A "lost opportunity" action is one in which it is possible that the bad outcome would have occurred even if the patient had received proper treatment. On the other hand, if there is no question that the proper treatment would have resulted in a good outcome and the patient has suffered a bad outcome, the plaintiff possesses a traditional medical-malpractice action. In order for a traditional medical-malpractice plaintiff to prevail, the plaintiff must prove that the bad outcome was more probably than not caused by the defendant's malpractice. In order for a "lost opportunity" plaintiff to prevail, the plaintiff must prove that the "lost opportunity" to achieve a better result was more probably than not caused by the defendant's malpractice and that the "lost opportunity" was greater than 50 percent. In order to determine whether the "lost opportunity" was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance; the postmalpractice chance must then be subtracted from 100; the former number must be divided by the latter number; and

---

(…continued)
present language of MCL 600.2912a(2). It is ironic, as Chief Justice Taylor points out, *ante* at 20 n 14, that the majority holding in *Fulton* continues apparently to be the law of our state, despite the fact that not a single justice on this Court agrees with this holding and despite the fact that three justices (those supporting Justice Cavanagh's opinion), who support the *dissent* in *Fulton,* are effectively marshaled in support of this conclusion. Nonetheless, I think that Chief Justice Taylor's analysis in this regard is correct.

37

then this quotient must be multiplied by 100 to obtain a percentage. The calculation can be summarized as follows:

$$\frac{(\text{Premalpractice chance}) - (\text{Postmalpractice chance})}{100 - (\text{Postmalpractice chance})} \times 100$$

If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail.

Because it is possible that the bad outcome in this case, i.e., amputation, would have occurred even if plaintiff had received proper treatment, the instant case is a "lost opportunity" action. Because plaintiff's "lost opportunity" was greater than 50 percent, I would affirm the result of the Court of Appeals.

Stephen J. Markman